ALEXANDER, COMMISSIONER OF INTERNAL
REVENUE *v.* "AMERICANS UNITED" INC.

No. 72–1371. Argued January 7, 1974—Decided May 15, 1974

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, *post,* p. 763. DOUGLAS, J., took no part in the decision of the case.

*Assistant Attorney General Crampton* argued the cause for petitioner. With him on the briefs were *Solicitor General Bork, Richard B. Stone, Stuart A. Smith, Ernest J. Brown, Grant W. Wiprud,* and *Leonard J. Henzke, Jr.*

*Alan B. Morrison* and *Franklin C. Salisbury* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging affirmance were filed by *H. David Rosenbloom, Harry J. Rubin, John Holt Myers, Samuel Rabinove,* and *Mortimer M. Caplin* for the Council on Foundations, Inc., and by *Thomas F. Field* for Tax Analysts and Advocates.

Mr. Justice Powell delivered the opinion of the Court.

Respondent is a nonprofit, educational corporation organized under the laws of the District of Columbia as "Protestants and Other Americans United for Separation of Church and State." Its purpose is to defend and maintain religious liberty in the United States by the dissemination of knowledge concerning the constitutional principle of the separation of church and State. In 1950, the Internal Revenue Service issued a ruling letter that respondent qualified as a tax-exempt organization under the predecessor provision to § 501 (c)(3) of the Internal Revenue Code of 1954 (the Code), 26 U. S. C. § 501 (c)(3).[1] As a result, the Service treated contributions to respondent as charitable deductions under the predecessor provision of § 170 (c)(2) of the Code, 26 U. S. C. § 170 (c)(2).[2] This situation continued unchanged until

[1] The predecessor provision of Code § 501 (c)(3) was § 101 (6) of the Internal Revenue Code of 1939. Section 501 (c)(3) describes the following as organizations exempt from federal income taxes by virtue of § 501 (a):

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

[2] The predecessor provision of § 170 (c)(2) of the Code was § 23 (o)(2) of the Internal Revenue Code of 1939. Section 170 (c)(2) defines a "charitable contribution" for purposes of § 170 (a), the charitable deduction provision, to mean a contribution or gift to or for the use of:

"A corporation, trust, or community chest, fund, or foundation—

April 25, 1969, when the Service issued a ruling letter revoking the 1950 ruling on the ground that respondent had violated §§ 501 (c)(3) and 170 (c)(2)(D) by devoting a substantial part of its activities to attempts to influence legislation.   Shortly thereafter, the Service issued another ruling letter exempting respondent from income taxation as a "social welfare" organization under Code § 501 (c)(4), 26 U. S. C. § 501 (c)(4).[3]   The effect of this change in status was to render respondent liable for unemployment (FUTA) taxes under Code § 3301, 26 U. S. C. § 3301,[4] and to destroy its eligibility for tax-deductible contributions under § 170.

---

"(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

"(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

"(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

The differences between the requirements of §§ 501 (c)(3) and 170 (c)(2) are minor and are not involved in this litigation.

[3] Section 501 (c)(4) lists the following organizations as qualifying under the § 501 (a) exemption from federal income taxes:

"Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."

[4] See Code § 3306 (c)(8), 26 U. S. C. § 3306 (c)(8).   Respondent began paying FUTA taxes in February 1970 and has stated its willingness to continue to do so in light of its relatively insubstantial

Because the 1969 ruling letter caused a substantial decrease in its contributions, respondent and two of its benefactors initiated the instant action in the United States District Court for the District of Columbia on July 30, 1970.[5] They sought a declaratory judgment that the Service's administration of the lobbying proscriptions of §§ 501 (c)(3) and 170 was erroneous or unconstitutional[6] and injunctive relief requiring rein-

---

liability for such taxes. The Service reports that respondent paid $981.13 in FUTA taxes for the year 1969, $1,052.60 for 1970, $889.09 for 1971, and $1,131.36 for 1972. Brief for Petitioner 4 n. 2.

Ordinarily, respondent's shift from § 501 (c)(3) status to § 501 (c)(4) status would also have meant that it would become subject to federal social security (FICA) taxes, since § 501 (c)(3) organizations are exempt from such taxes but § 501 (c)(4) organizations are not. Code § 3121 (b)(8)(B), 26 U. S. C. § 3121 (b)(8)(B). This distinction is not involved here, however, because respondent in prior years voluntarily elected to pay FICA taxes although it held § 501 (c)(3) status. This election had been in effect for more than eight years, which rendered respondent incapable of terminating its election to pay FICA taxes even if it had retained its § 501 (c)(3) status. Code § 3121 (k)(1)(D), 26 U. S. C. § 3121 (k)(1)(D).

[5] Federal jurisdiction was founded on 28 U. S. C. §§ 1331 and 1340 and on § 10 of the Administrative Procedure Act, now 5 U. S. C. §§ 701–706.

[6] The amended complaint identified five claims: (1) that the lobbying proscriptions of §§ 501 (c)(3) and 170 (c)(2)(D) and the Service's administration of them were unconstitutional due to the restrictions imposed on the exercise of First Amendment rights of political advocacy by respondent and its contributors; (2) that the "substantial part" test of these provisions denied equal protection of the laws in conflict with the Due Process Clause of the Fifth Amendment, by allowing large tax-exempt organizations to engage in a greater quantum of lobbying activity than is allowed to smaller organizations; (3) that this disparity in the absolute amounts of lobbying activity allowed large and small § 501 (c)(3) organizations enabled certain large churches to engage in more lobbying in favor of government aid to church schools than respondent could bring to

statement of respondent's § 501 (c)(3) ruling letter. Because their objections to the Service's action included a facial challenge to the constitutionality of federal statutes, they also requested the convening of a three-judge district court pursuant to 28 U. S. C. § 2282.

The Service moved to dismiss the action, principally on the ground that the exception in the Declaratory Judgment Act for cases "with respect to Federal taxes," [8] and the prohibition in the Anti-Injunction Act against suits "for the purpose of restraining the assessment or collection of any tax," [9] ousted the court of subject-

bear in opposition, thereby violating the plaintiffs' rights under the Establishment and Free Exercise Clauses of the First Amendment; (4) that the statutory standards of "substantial part" and "propaganda" were so lacking in specificity that they constituted an invalid delegation of legislative power to the Service; and (5) that the Service acted arbitrarily and capriciously in revoking respondent's § 501 (c)(3) exemption. The last two contentions apparently were not advanced in the Court of Appeals. There the argument centered on the "discriminatory" aspects of the "substantial part" test identified above as claim (2).

[7] Specifically, respondent and its coplaintiffs sought to have the exemption clauses of § 501 (c)(3) severed from the remainder of that section and declared unconstitutional.

[8] The federal tax exception to the Declaratory Judgment Act appears in 28 U. S. C. § 2201:

"In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." (Emphasis added.)

[9] The Anti-Injunction Act (Income Tax Assessment) is set forth in Code § 7421 (a), 26 U. S. C. § 7421 (a):

"Except as provided in sections 6212 (a) and (c), 6213 (a), and 7426 (a) and (b)(1), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court

matter jurisdiction. The District Court accepted this argument, refused to convene a three-judge court, and dismissed the complaint in an unpublished order filed March 9, 1971. The United States Court of Appeals for the District of Columbia Circuit affirmed the dismissal insofar as it pertained to the individual plaintiffs, but it reversed as to respondent and remanded the case to the District Court with instructions to convene a three-judge court. *"Americans United" Inc.* v. *Walters,* 155 U. S. App. D. C. 284, 477 F. 2d 1169 (1973). The Service petitioned for review, and we granted certiorari. 412 U. S. 927 (1973). We reverse.

In our opinion in *Bob Jones University* v. *Simon, ante,* p. 725, we examined the meaning of the Anti-Injunction Act and its interpretation in prior opinions of this Court, and we reaffirmed our adherence to the two-part test announced in *Enochs* v. *Williams Packing & Navigation Co.,* 370 U. S. 1 (1962). To reiterate, the Court in *Williams Packing* unanimously held that a pre-enforcement injunction against the assessment or collection of taxes may be granted only (i) "if it is clear that under no circumstances could the Government ultimately prevail . . . ," *id.,* at 7, and (ii) "if equity jurisdiction otherwise exists." *Ibid.* Unless both conditions are met, a suit for preventive injunctive relief must be dismissed.

In the instant case the Court of Appeals recognized *Williams Packing* as controlling precedent for respondent's individual coplaintiffs and affirmed the dismissal of the suit as to them. 155 U. S. App. D. C., at 292, 477 F. 2d, at 1177. The court held that the relief requested by the individual plaintiffs "relate[d] directly to the assessment and collection of taxes" and that the allegations of

---

by any person, whether or not such person is the person against whom such tax was assessed."

None of the exceptions is relevant to this case.

infringements of constitutional rights were "to no avail" in overcoming the barrier of § 7421 (a). *Id.;* at 291, 477 F. 2d, at 1176. The court also recognized that respondent could not satisfy the *Williams Packing* criteria, *id.*, at 298, 477 F. 2d, at 1183, but concluded that respondent's suit was without the scope of the Anti-Injunction Act and therefore not subject to the *Williams Packing* test.[10]

The court's conclusion with regard to respondent rested on the confluence of several factors. One was the constitutional nature of respondent's claims. As the court noted, the thrust of respondent's argument is not that it qualifies for a § 501 (c)(3) exemption under existing law but rather that that provision's "substantial part" test and proscription against efforts to influence legislation are unconstitutional. *Id.*, at 293, 477 F. 2d, at 1178. Obviously, this observation could not have been dispositive to the Court of Appeals, for this factor does not differentiate respondent, which was allowed to sue, from the individual coplaintiffs, who likewise pressed constitutional claims but who were dismissed from the action. Furthermore, decisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim, as distinct from its probability of success, is of no consequence under the Anti-Injunction Act. *E. g.,*

---

[10] The Court of Appeals also held that the scope of the "except with respect to Federal taxes" clause of the Declaratory Judgment Act, see n. 8, *supra,* is coterminous with the Anti-Injunction Act ban against suits "for the purpose of restraining the assessment or collection of any tax" despite the broader phrasing of the former provision. 155 U. S. App. D. C. 284, 291, 477 F. 2d 1169, 1176. While we take no position on this issue, it is in any event clear that the federal tax exception to the Declaratory Judgment Act is at least as broad as the prohibition of the Anti-Injunction Act. Because we hold that the latter Act bars the instant suit, there is no occasion to deal separately with the former. See *Bob Jones University* v. *Simon, ante,* at 732–733, n. 7.

*Bailey* v. *George,* 259 U. S. 16 (1922); *Dodge* v. *Osborn,* 240 U. S. 118 (1916).

The other three factors identified by the Court of Appeals are equally unpersuasive. First, the court noted that respondent "does not seek in this lawsuit to enjoin the assessment or collection of its own taxes." 155 U. S. App. D. C., at 292, 477 F. 2d, at 1177. Because respondent volunteered to pay FUTA taxes even if it obtained an injunction restoring its § 501 (c)(3) status, this observation, we may assume, is correct. It is also irrelevant. Section 7421 (a) does not bar merely a taxpayer's attempt to enjoin the collection of his own taxes. Rather, it declares in sweeping terms that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." [11] Thus a suit to enjoin the assessment or collection of anyone's taxes triggers the literal terms of § 7421 (a).

Perhaps the real point of the court's observation about respondent's taxes was to set the stage for its more pertinent conclusion that restraining the assessment or collection of taxes was "at best a collateral effect" of respondent's action and that this suit arose "in a posture removed from a restraint on assessment or collection." 155 U. S. App. D. C., at 294, 477 F. 2d, at 1179. We disagree. Under any reasonable construction of the statutory term "purpose," the objective of this suit was to restrain the assessment and collection of taxes from respondent's contributors. The obvious

---

[11] The portion of § 7421 (a) beginning with "by any person" was added to the Act in 1966. See *Bob Jones University* v. *Simon, ante,* at 731–732, n. 6. As we noted there, however, the "by any person" phrase reaffirms the plain meaning of the original language of the Act.

purpose of respondent's action was to restore advance assurance that donations to it would qualify as charitable deductions under § 170 that would reduce the level of taxes of its donors.[12] Indeed, respondent would not be interested in obtaining the declaratory and injunctive relief requested if that relief did not effectively restrain the taxation of its contributors. Thus we think it circular to conclude, as did the Court of Appeals, that respondent's "primary design" was not "to remove the burden of taxation from those presently contributing but rather to avoid the disposition of contributed funds away from the corporation." *Ibid.* The latter goal is merely a restatement of the former and can be accomplished only by restraining the assessment and collection of a tax in contravention of § 7421 (a).

Finally, the Court of Appeals emphasized that respondent had no "alternate legal remedy in the form of adequate refund litigation . . . ." *Id.,* at 295, 477 F. 2d, at 1180. The court recognized, of course, that respondent does have an opportunity to litigate its claims in an action for refund of FUTA taxes but dismissed this alternative with the statement that "it is subject to certain conditions and, we feel, is so far removed from the mainstream of the action and relief sought as to hardly be considered adequate." *Id.,* at 294 n. 13, 477 F. 2d, at 1179 n. 13. The import of these comments is unclear. If they are taken to mean that a refund action is, as a practical matter, inadequate to avoid the decrease in respondent's contributions for the interim between the withdrawal of § 501 (c)(3) status and the final adjudication of its en-

---

[12] Alternatively, this suit was intended to reassure private foundations that they could make contributions to respondent without risk of tax liability under Code § 4945 (d)(5), 26 U. S. C. § 4945 (d)(5). In this respect, the purpose of this action was to restrain the assessment of taxes against such foundations.

titlement to that exemption, they are certainly accurate. This, however, is only a statement of irreparable injury, which is the essential prerequisite for injunctive relief under traditional equitable standards and only one part of the *Williams Packing* test. As noted in *Bob Jones, ante,* at 745–746, allowing injunctive relief on the basis of this showing alone would render § 7421 (a) quite meaningless.

If, on the other hand, the court's comments about the inadequacy of a refund action for FUTA taxes are interpreted to mean that respondent lacks an opportunity to have its claims finally adjudicated by a court of law, we think they are inaccurate. Respondent's liability for FUTA taxes hinges on precisely the same legal issue as does its eligibility for tax-deductible contributions under § 170, namely its entitlement to § 501 (c)(3) status. And respondent will have a full opportunity to litigate the legality of the Service's withdrawal of respondent's § 501 (c)(3) ruling letter in a refund suit following the payment of FUTA taxes. *E. g., Christian Echoes National Ministry, Inc.* v. *United States,* 470 F. 2d 849 (CA10 1972), cert. denied, 414 U. S. 864 (1973).[13]

---

[13] That respondent has voluntarily paid FUTA taxes rather than challenging their imposition via a refund suit does not alter this conclusion. A taxpayer cannot render an available review procedure an inadequate remedy at law by voluntarily forgoing it. See *Graham* v. *Du Pont,* 262 U. S. 234 (1923).

It should also be noted that this case cannot be distinguished from *Bob Jones, ante,* p. 725, on the ground that petitioner in that case in theory will be subject to federal income taxes upon termination of its § 501 (c)(3) status, whereas respondent in this case will not, given that it has established § 501 (c)(4) status. Refund suits for federal income taxes and for FUTA (or FICA) taxes are fungible in the present context. So long as the imposition of a federal tax, without regard to its nature, follows from the Service's withdrawal of § 501 (c)(3) status, a refund suit following

We therefore conclude that there are no valid reasons to distinguish this case from *Williams Packing* for purposes of § 7421 (a) or to exempt respondent's suit from the dual requirements enunciated in that case.[14]  The judgment is reversed.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the decision of this case.

MR. JUSTICE BLACKMUN, dissenting.

Finding myself in solitary dissent in this "tax" case, I am somewhat diffident about expressing views contrary to those the Court apparently has reached so easily. I do so only because I am disturbingly aware of the overwhelming power of the Internal Revenue Service. This power is such that its mere exercise often freezes tax status so as to endanger the existence of philanthropic organizations and the public benefits they secure, merely because the path to judicial review is so discouragingly long and expensive.  I write primarily, therefore, to express what I feel is a needed word of caution about governmental power where the means to challenge that power are unfavorable and unsatisfactory at best.

---

the collection of that tax is an appropriate vehicle for litigating the legality of the Service's actions under § 501 (c)(3).  As noted in *Bob Jones,* ante, at 748 n. 22, we need not decide now the range of remedies available in such a refund suit, which, unlike this suit, is brought pursuant to congressionally authorized procedures.

[14] We think our reading of § 7421 (a) is compelled by the language and apparent congressional purpose of this statute.  The consequences of the present regime for § 501 (c)(3) organizations can be harsh indeed, as MR. JUSTICE BLACKMUN ably articulates in his dissenting opinion today.  As we noted in *Bob Jones,* ante, at 749–750, this may well be a subject meriting congressional consideration.

## I

"Americans United" Inc. (AU) is a District of Columbia nonprofit educational corporation organized in 1948. For almost 18 years AU was formally recognized by the Service as exempt from federal income tax under § 501 (c)(3) of the Internal Revenue Code of 1954, 26 U. S. C. § 501 (c)(3),[1] and its predecessor, § 101 (6) of the Internal Revenue Code of 1939.

On April 25, 1968, however, the Commissioner of Internal Revenue revoked AU's letter-ruling exemption on the ground that the organization no longer met the requirements of § 501 (c)(3) and, instead, was an "action" organization, within the definition of Treasury Regulations §§ 1.501 (c)(3)–1 (c)(3)(i) and (iv), in that a substantial part of its activities was devoted to the pursuit of objectives to influence legislation App. 7–10. The loss of its § 501 (c)(3) status, however, did not result

---

[1] AU's exemption ruling, under § 101 (6) of the 1939 Code, was issued July 3, 1950. Section 501 reads in pertinent part as follows:
"§ 501. Exemption from tax on corporations, certain trusts, etc.
"(a) Exemption from taxation.
"An organization described in subsection (c) . . . shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

"(c) List of exempt organizations.
"The following organizations are referred to in subsection (a):

"(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statemer's), any political campaign on behalf of any candidate for public office."

in AU's becoming subject to federal income tax. This was because AU qualified as a civic league or other organization to which § 501 (c)(4) has application.[2]

The result, nevertheless, was distinctly adverse to AU in two respects. A contribution to the organization no longer was deductible by the donor under §§ 170 (a)(1) and (c)(2)(D) of the 1954 Code, 26 U. S. C. §§ 170 (a)(1) and (c)(2)(D), the latter of which closely parallels but is not identical with § 501 (c)(3). As a matter of much less concern, AU also became subject to federal unemployment tax under § 3301 of the Code, 26 U. S. C. § 3301, for exemption therefrom for § 501 organizations is limited to those that qualify under § 501 (c)(3). § 3306 (c)(8) of the 1954 Code, 26 U. S. C. § 3306 (c)(8).[3] AU has paid federal unemployment taxes,[4] and has stipulated that it will continue to do so.

---

[2] Section 501 (c)(4) relates to:

"(4) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."

[3] Although, under § 3121 (b)(8)(B) of the 1954 Code, 26 U. S. C. § 3121 (b)(8)(B), AU was not required to pay tax imposed by the Federal Insurance Contributions Act so long as it was exempt under § 501 (c)(3), it had elected to do so, as was its privilege under § 3121 (k)(1)(A), 26 U. S. C. § 3121 (k)(1)(A). Termination of this accepted responsibility for tax requires two years' advance written notice and cannot be effected at all after an organization has been subjected to the tax eight years or more. § 3121 (k)(1)(D), 26 U. S. C. § 3121 (k)(1)(D). AU has been so taxed for more than eight years. Thus, it is unable to terminate its responsibility for tax under the FICA even if it were to continue as a § 501 (c)(3) organization.

[4] AU paid $981.13 in federal unemployment tax for 1969; $1,052.60 for 1970; $889.09 for 1971; and $1,131.36 for 1972. Brief for Petitioner 4 n. 2.

As a result of the revocation of its § 501 (c)(3) status, contributions by donors to AU declined sharply so that for the first time the organization was not able to raise enough funds to cover its expenses. AU and two of its benefactors then sought relief by the present suit.[5] They have alleged that the substantiality test of §§ 501 (c)(3) and 170 (c)(2)(D) created an unconstitutional disparity between large and small organizations; that the Commissioner revoked AU's exemption ruling punitively; that

---

[5] The amended complaint requested both declaratory and injunctive relief. The latter, however, would be fully adequate and a declaratory judgment, as such, would not be needed. Accordingly, I am concerned only with the applicability of the Anti-Injunction Act, § 7421 (a) of the Code, 26 U. S. C. § 7421 (a).

The Commissioner has asserted that the Declaratory Judgment Act, 28 U. S. C. §§ 2201–2202, also provides a jurisdictional barrier to the suit because its general applicability is limited by the phrase, "except with respect to Federal taxes." While not reaching the question, I would agree with the Court's observation in the companion case, *Bob Jones University* v. *Simon, ante,* at 732–733, n. 7, that questions exist as to the scope of § 2201 and as to whether it is coterminous with § 7421 (a).

The Commissioner also asserts that the doctrine of sovereign immunity bars the present action; I do not agree. The suit, as the Court of Appeals noted, 155 U. S. App. D. C. 284, 295, 477 F. 2d 1169, 1180, falls within the immunity doctrine's exceptions enunciated in *Dugan* v. *Rank,* 372 U. S. 609, 621–622 (1963): "(1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." Here, the claim is made that § 501 (c)(3) is unconstitutional and that the Commissioner administers the section in an unconstitutional manner.

In *Green* v. *Connally,* 330 F. Supp. 1150 (DC 1971), the court granted relief against Treasury officials comparable to that sought here. Inasmuch as the defense of sovereign immunity is jurisdictional, *United States* v. *Sherwood,* 312 U. S. 584, 586 (1941), this Court's summary affirmance of the *Green* case *sub nom. Coit* v. *Green,* 404 U. S. 997 (1971), affords pertinent precedent.

it was unconstitutional to penalize First Amendment activity in this manner; and that § 501 (c)(3)'s "substantial" and "propaganda" standards were unconstitutionally vague. AU sought reinstatement on the IRS Cumulative List of Organizations so that contributions to it would be deductible by donors under §§ 170 (a)(1) and (c)(2)(D).

## II

The Anti-Injunction Act, § 7421 (a) of the Code, 26 U. S. C. § 7421 (a), reads in part:

> "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."

In considering § 7421 (a), a two-step analysis is necessary: (1) When does the statute apply? (2) When it is applicable, under what circumstances is an exception permitted? It seems to me that the Court overlooks the first question in order to apply mechanically the criteria for an exception to the application of § 7421 (a).

The threshold question, obviously, is whether the present litigation is a "suit for the purpose of restraining" any tax. It is conceded that AU has no income tax liability and will have none regardless of the outcome of this litigation. AU has paid, and will continue to pay, federal unemployment taxes. Its assumption of FICA tax liability is frozen and cannot now be terminated.

It is in the context of this fixed and certain status as to all these federal taxes—income, unemployment, FICA—that "the purpose" of the present litigation, within the meaning of § 7421 (a), must be ascertained. AU asserts that the purpose is to determine its charitable status so far as benefactors are concerned. Indeed, one

surely must concede that, within the literal import of the statute's words, the suit is not one "for the purpose of restraining . . . any tax." It is, instead, a suit to assure the continuance of contributions utilized to sustain AU's operations.

I would not attribute to Congress, however, so simplistic a prohibition in § 7421 (a) as to enable an organization to circumvent the statutory barrier by a subjective protestation of the purpose for which an injunction is sought. In order to ascertain legislative intent, it is necessary to consider effect as well as purpose and thus to bring objective criteria into the analysis. See Recent Development, 73 Col. L. Rev. 1502, 1508–1510 (1973).

In *Bob Jones University* v. *Connally,* 472 F. 2d 903, 906 (1973), the Fourth Circuit concluded that when the withdrawal of an exemption "would ultimately result in potentially greater tax revenues," the obvious purpose of a suit to enjoin the withdrawal is to prevent the assessment of tax, and § 7421 (a) would be applicable. Thus, "purpose" was equated with ultimate tax effect. *Crenshaw County Private School Foundation* v. *Connally,* 474 F. 2d 1185, 1188 (CA5 1973), pet. for cert. pending No. 73–170, has a similar focus. In the present case the Court of Appeals took a different approach:

> "The restraint upon assessment and collection is at best a collateral effect of the action, the primary design not being to remove the burden of taxation from those presently contributing but rather to avoid the disposition of contributed funds away from the corporation." 155 U. S. App. D. C. 284, 293–294, 477 F. 2d 1169, 1178–1179.

In this view, applicability of the statute depends on the direct effect the relief sought would have on the plaintiff and not on the system as a whole.

As has been noted, the result of the injunction sought here would not directly inhibit the collection of tax from AU. It is also highly speculative what collateral effect, if any at all, the suit could possibly have on the federal revenue. If the assertion that AU's contributions have dried up is to be accepted, as I suspect it must be, I would presume that its erstwhile contributors have found other objects for their bounty, that is, other organizations whose names remain on the Service's vitally important Cumulative List. When nothing more than possible collateral effect on the revenues is involved, the Court's wide-ranging test of applicability of §7421 (a), announced today, is, for me, too attenuated and too removed to be encompassed within the intendment of the statute's phrase, "for the purpose of restraining the assessment or collection of any tax."

In *Enochs* v. *Williams Packing & Navigation Co.*, 370 U. S. 1 (1962), this Court observed that the object of §7421 (a) "is to withdraw jurisdiction from the . . . courts to entertain suits seeking injunctions prohibiting the collection of federal taxes," and "to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Id.*, at 5 and 7. There undoubtedly is appropriate concern about the underlying danger that a multitude of spurious suits, or even of suits with possible merit, would so interrupt the free flow of revenues as to jeopardize the Nation's fiscal stability. See, *e. g.*, *State Railroad Tax Cases*, 92 U. S. 575, 613–614 (1876); *Cheatham* v. *United States*, 92 U. S. 85, 89 (1876). Certainly, precollection suits could threaten planning and budgeting. But I do not perceive how the injunction desired in this case interferes with the area of concern that is the subject of §7421 (a). Any po-

tential increase in revenues because donors no longer may contribute to AU and thereby obtain a § 170 (a)(1) deduction is, at best, only minor and speculative and is neither significant nor controlling. I, therefore, would accept "direct effect on the plaintiff" as a component to be considered in the ascertainment of the true "purpose" of the suit, within the meaning and reach of § 7421 (a).

I do not wish to indicate disapproval of *Williams Packing.* There a taxpayer sought to enjoin the collection of taxes. As the basis for equitable jurisdiction, it asserted that it would be thrown into bankruptcy if it were required to pay the taxes it challenged. The Court carefully noted that there may well be situations where "the central purpose of the Act is inapplicable and . . . the attempted collection may be enjoined." 370 U. S., at 7. To be sure, the Court narrowly confined exceptions to § 7421 (a) to instances where the plaintiff would suffer irreparable injury and where it was "clear that under no circumstances could the Government ultimately prevail." *Ibid.* If, however, this test is met, then the "manifest purpose" of the statute—to permit the collection of taxes without judicial intervention—is "inapplicable." The Court thus made it clear that there was an element, in addition to the traditional equity considerations previously spelled out in *Miller* v. *Standard Nut Margarine Co.,* 284 U. S. 498 (1932), that must be present in order to avoid the proscription of the Anti-Injunction Act.

*Williams Packing,* of course, on its facts, is clearly distinguishable from this case. There the purpose of the suit was directly to restrain the collection of social security and unemployment taxes allegedly past due from that taxpayer. Here the avowed purpose is not to restrain tax collection but to assure AU's restoration to the Cumulative List. In *Williams Packing* it was the incidence of taxation that was challenged and the ir-

reparable injury of prospective payment of the tax was claimed as the equitable basis for the injunction. Nothing remotely resembling that is present here. To read *Williams Packing* as broadly as the Court does today is to make § 7421 (a) more restrictive than the Court in *Williams Packing* or Congress intended. The result is that § 7421 (a) becomes an absolute bar to any and all injunctions, irrespective of tax liability, of purpose or effect of the suit, or of the character of the Service's action.

There is a further consideration. Arguably, where the challenged governmental action is not one intended to produce revenue but, rather, is one to accomplish a broad-based policy objective through the medium of federal taxation, the application of § 7421 (a) is inappropriate.[6]

---

[6] Some courts have endorsed this approach. In *McGlotten* v. *Connally,* 338 F. Supp. 448 (DC 1972), a suit to enjoin, among other things, the continuation of tax exempt status of organizations that excluded nonwhites from membership, Chief Judge Bazelon, in writing for a three-judge District Court, stated:

"Plaintiff's action has nothing to do with the collection or assessment of taxes. He does not contest the amount of his own tax, nor does he seek to limit the amount of tax revenue collectible by the United States. . . . In the present case, the central purpose [of the statute] is clearly inapplicable." *Id.,* at 453–454 (footnotes omitted).

See also *Green* v. *Connally,* 330 F. Supp. 1150 (DC), aff'd *per curiam sub nom. Coit* v. *Green,* 404 U. S. 997 (1971), where the three-judge court did not mention § 7421 (a) specifically but permitted the suit and granted relief; *Bob Jones University* v. *Connally,* 472 F. 2d 903, 907–908 (CA4 1973) (dissenting opinion). And see the opinion of the Court of Appeals in the present case. 155 U. S. App. D. C., at 293–294, 477 F. 2d, at 1178–1179.

The purpose of the IRS action of itself is not controlling. The Court has found that "taxes" in the nature of a penalty were not within the meaning of § 7421 (a); *Hill* v. *Wallace,* 259 U. S. 44 (1922); *Lipke* v. *Lederer,* 259 U. S. 557 (1922), and has rejected, as well, the contention that an injunction could issue against a

Obviously, § 501 (c)(3) as not designed to raise money.[7]
Its purpose, rather, is to assure the existence of truly
philanthropic organizations and the continuation of the
important public benefits they bestow.[8]

regulatory tax as opposed to a revenue measure. *Sonzinsky* v.
*United States,* 300 U. S. 506 (1937). The Court relies on *Bailey* v.
*George,* 259 U. S. 16 (1922), for the principle that even the collec-
tion of an unconstitutional tax cannot be enjoined. All these situa-
tions, however, have a factor in common with *Williams Packing*
that is absent from the present suit: AU does not seek to restrain
the Government's act of collecting any tax that it owes.

[7] Commissioner Alexander spoke to this effect in remarks to
the American Society of Association Executives in New Orleans
August 29, 1973:

"The IRS recognizes that the exempt organization provisions of the
law must be interpreted and administered in light of their special
purpose and their place in the tax law. . . Their purpose is *not* to raise
revenue. Rather, they are designed to act as a guardian. They in-
sure that exempt organization assets will be put to the approved uses
contemplated in the law. . Their application calls for an extraor-
dinary degree of care and judgment." BNA Daily Tax Report, Aug.
30, 1973, p. J–1.

[8] The value of philanthropic organizations must be balanced
against the revenue-raising objectives of the tax laws. Some of
the factors to be weighed in this balance are reflected in the 1965
Treasury Department Report on Private Foundations:

"Private philanthropic organizations can possess important char-
acteristics which modern government necessarily lacks. They may
be many-centered, free of administrative superstructure, subject to
the readily exercised control of individuals with widely diversified
views and interests. Such characteristics give these organizations
great opportunity to initiate thought and action, to experiment with
new and untried ventures, to dissent from prevailing attitudes, and
to act quickly and flexibly. Precisely because they can be initiated
and controlled by a single person or a small group, they may
evoke great intensity of interest and dedication of energy. These
values, in themselves, justify the tax exemptions and deductions
which the law provides for philanthropic activity.

"Private foundations play a significant part in the work of philan-
thropy. While the foundation is a relatively modern development,

Another very important factor deserving consideration in this context is the hazard of vesting in the Commissioner virtual plenipotentiary power over philanthropic organizations. Although there can be little question that the Commissioner, under § 7805 (a) of the Code, 26 U. S. C. § 7805 (a), is properly vested with broad powers to "prescribe all needful rules and regulations for the enforcement" of the tax laws, there is nothing in the Code that suggests that he must be fully insulated from challenge when effectuating social policy.

AU has charged unconstitutional treatment pursuant to an unconstitutional provision. These are claims peculiarly within the province of courts and not of the Executive's administrative officers. The Court's opinion makes clear that a claim of this kind is now precluded from judicial determination until such time as the Court concludes that the Government could not ultimately prevail on the merits. Unless and until that conclusion is reached, the philanthropic organization is at the mercy of the Commissioner for the period of time—usually a

---

its predecessor, the trust, has ancient vintage. Like its antecedent, the foundation permits a donor to commit to special uses the funds which he gives to charity. ... . In these ways, foundations have enriched and strengthened the pluralism of our social order.

"Private foundations have also preserved fluidity and provided impetus for change within the structure of American philanthropy. Operating charitable organizations tend to establish and work within defined patterns. . . . The assets of private foundations, on the other hand, are frequently free of commitment to specific operating programs or projects; and that freedom permits foundations relative ease in the shift of their focus of interest and their financial support from one charitable area to another. New ventures can be assisted, new areas explored, new concepts developed, new causes advanced. Because of its unique flexibility, then, the private foundation can constitute a powerful instrument for evolution, growth, and improvement in the shape and direction of charity." Senate Committee on Finance, 89th Cong., 1st Sess., 12–13 (Comm. Print 1965).

substantial one—it takes for a claim to be filed and to work its way through the adjudicative process in the guise of a refund suit with its myriad pitfalls. And even this route is possible only if the organization has a tax that has been paid.[9] See Part III, *infra*.

The Court in *Bob. Jones University, ante,* at 729–730, acknowledges that "appearance on the Cumulative List is a prerequisite to successful fund raising for most charitable organizations." The program of exemption by letter ruling, therefore, is tantamount to a licensing procedure. If the Commissioner's authority were limited by a clear statutory definition of § 501 (c)(3)'s requirement of "no substantial part," or by an objective definition of what is "charitable," there would be less concern about possible administrative abuse.[10] But where the philanthropic organization is concerned, there appears to be little to circumscribe the almost unfettered power of the Commissioner.[11] This may be very well so long

---

[9] The Commissioner states that the majority of organizations exempt under § 501 (c)(3) operate at a loss so that no income tax liability would result if their exemptions were revoked. *Bob Jones University* v. *Simon,* Brief for Petitioner 23 n. 22.

[10] As has been noted, one of AU's claims is that "substantial" and "propaganda," as these words are employed in § 501 (c)(3), are unconstitutionally vague. There are no clear objective criteria by which the Commissioner draws his conclusions with respect to these terms. Moreover, the § 501 (c)(3) revocation is arrived at by the Commissioner not solely by construing the language of § 501 (c)(3), but by his assertion that that section and §§ 170 (a)(1) and (c)(2)(D) are *in pari materia.* Thus, the idiosyncrasies of the word "charitable" in § 170 (a)(1) are engrafted upon, and entwined with, the "organized and operated exclusively for religious, charitable . . . or educational purposes" standard of § 501 (c)(3). This is nowhere compelled by statute, but is the product of the Commissioner's discretionary application and interpretation.

[11] In *Bob Jones University, ante,* at 740, the Court suggests that so long as an action of the Service reflects "a good-faith effort to

as one subscribes to the particular brand of social policy the Commissioner happens to be advocating at the time (a social policy the merits of which I make no attempt to evaluate), but application of our tax laws should not operate in so fickle a fashion. Surely, social policy in the first instance is a matter for legislative concern. To the extent these determinations are reposed in the authority of the Internal Revenue Service, they should have the system of checks and balances provided by judicial review *before* an organization that for years has been favored with an exemption ruling is imperiled by an allegedly unconstitutional change of direction on the part of the Service.

When an organization which has appeared on the Cumulative List seeks to enjoin what it claims is its illegal removal from that List and has no direct income tax liability or a *de minimis* collateral liability, the injunction, in my view, should not be within the prohibition of § 7421 (a).

### III

Concluding, as I have, that § 7421 (a) is not a bar to an injunction by AU, the traditional equitable considera-

---

enforce the technical req: ements of the tax laws," the presence of a collateral motive does not render the Anti-Injunction Act inapplicable. I do not perceive just where the good-faith inquiry is made. It certainly is not made at the determination whether a suit is for the purpose of restraining taxes. It is doubtful that it is made in determining whether there are any circumstances under which the Government may ultimately prevail on the merits. Moreover, for me, there is a distinct question as to the meaning of the Court's phrase, "a good-faith effort to enforce the technical requirements of the tax laws." Is innovation in effectuating social policy a good-faith effort to enforce technical requirements? Is a threat to revoke a university's exemption ruling made in good faith when it rests on the proposition that the institution does not comply with government-approved admission standards?

tions of irreparable injury and adequate alternative remedy must determine whether injunctive relief is appropriate. This is an inquiry independent of the question whether the Anti-Injunction Act applies, and is no different from the inquiry as to when injunctive relief is appropriate outside the tax field. See, for example, *Public Service Comm'n* v. *Wycoff Co.,* 344 U. S. 237, 240–241 (1952); *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500, 506–507 (1959). AU makes a vigorous and pressing claim that it is and will be irreparably injured by the loss of contributions since donors no longer receive an income tax deduction, and that this loss is completely unrecoverable even were AU ultimately to prevail on the merits. The Court in its opinion, *ante,* at 761–762, seems to accept the fact of irreparable injury here, just as the Court of Appeals recognized its presence as virtually inevitable. 155 U. S. App. D. C., at 292, 477 F. 2d, at 1177. Even where it has been found that § 7421 (a) bars a suit, it has been recognized that revocation of exempt status is an irreparable injury that otherwise satisfies the condition for the granting of injunctive relief. See, for example, *Bob Jones University* v. *Connally,* 472 F. 2d, at 906.

In addition to irreparable injury, the plaintiff must show that he has no adequate remedy at law. *Wilson* v. *Shaw,* 204 U. S. 24, 31 (1907). The Commissioner suggests that a plaintiff organization usually has three alternative remedies, any one of which is adequate: an income tax refund suit, a federal unemployment tax or FICA tax refund suit, and an accommodation suit by a selected donor in the form of testing his claim to a charitable deduction under §§ 170 (a) (1) and (c) (2) (D).

In AU's case the Commissioner, of course, cannot and does not contend that the income tax refund suit alternative is available. AU received § 501 (c) (4) status upon

revocation of its § 501 (c)(3) exemption, and it is not subject to federal income tax so long as it retains § 501 (c)(4) status. Whenever that alternative is available, as in *Bob Jones University, ante,* p. 725, such availability not only indicates the existence of a remedy at law but that the direct effect of an injunction would be to restrain the collection of taxes.

An FICA tax refund suit is not available as an alternative to AU, since AU has made its election under § 3121 (k)(1)(A) and that election is now irrevocable. See n. 3, *supra.* Although AU conceivably might bring a refund suit for federal unemployment taxes,[12] the real question, and a substantial one, is whether that remedy is adequate for AU and is an effective route for the determination of the issues involved.

A suit for refund of federal unemployment tax, authorized under § 7422 of the Code, 26 U. S. C. § 7422, and with a period of limitations imposed by § 6532 (a), is directly geared to a determination of the technical

---

[12] The Court assumes the ready availability of an FUTA refund suit. *Ante,* at 762–763, n. 13. It is curious, however, that the Commissioner did not assert this possibility in the earlier stages of the litigation. It was suggested, apparently, only after the main briefing in the Court of Appeals. Tr. of Oral Arg. 36–37. It is also noteworthy that in discussing the problem former Commissioner Thrower has stated:

"There is no practical possibility of quick judicial appeal at the present. If we deny tax exemption or the benefit to the organization of its donors having the assurance of deductibility of contributions, the organization must either create net taxable income or other tax liability for itself as a litigable issue, or find a donor who as a guinea pig is willing to make a contribution, have it disallowed, and litigate the disallowance." Thrower, IRS Is Considering Far Reaching Changes in Ruling on Exempt Organizations, 34 J. of Taxation 168 (1971).

Whether procedurally feasible or not, there is some indication that such suits are not common practice.

aspects of FUTA liability and not to the larger constitutional issues. At most, the refund suit is an artificial vehicle to adjudicate questions other than entitlement to refund; its focus is on liability and not on eligibility under §§ 170 (a)(1) and (c)(2)(D). It is most doubtful, also, that potential contributors would regard a favorable outcome in such a suit as possessing the reliability of a favorable letter ruling. Assuming that AU could litigate its constitutional claims in an FUTA refund suit, see *Christian Echoes National Ministry, Inc. v. United States,* 470 F. 2d 849 (CA10 1972), cert. denied, 414 U. S. 864 (1973),[13] there are other obstacles in its path.

The suit for refund may not be maintained until a claim for refund has been filed. § 7422. The federal unemployment tax is imposed on an annual basis; thus, no refund can be claimed until the expiration of the year for which the tax is paid. Section 6532 (a)(1), as usual, precludes the suit until the claim is denied or six months have passed from the date of filing. Once suit is instituted, the Government has at least 60 days to answer the complaint. Under optimum conditions and with cooperation, the minimum period of time required to achieve the objective through the refund suit is one to two years from the time of revocation.[14] This is the delay if the

---

[13] In *Christian Echoes* a nonprofit religious corporation sued for refund of FICA taxes in an aggregate amount exceeding $103,000 paid over seven taxable years. The purpose of the suit, of course, was to recover the taxes paid, but constitutional challenges to § 501 (c)(3) were the basic legal arguments. There is no suggestion in the court's opinion that Christian Echoes' primary concern was with the loss of contributions; this, however, must have been of relative importance.

[14] Former Commissioner Thrower, in the article cited above, stated that "the issue under the best of circumstances could hardly come before a court until at least a year after the tax year in which the is-

organization wins and no Government appeal is taken. If an appeal follows, the delay in ultimate resolution drags on. *E. g., Christian Echoes, supra,* where the ruling was revoked in 1966 and final judicial review was concluded only in 1973. While this is perhaps to be expected, and must be endured, in an ordinary tax refund suit, a delay of this magnitude defeats the adequacy of remedy when a philanthropic organization's very existence is at stake.

There are still other hazards. When small sums are at issue, as with AU's FUTA liability, the Government inadvertently or intentionally may concede the refund. This is not unlikely, for sound administration may not warrant the time and expense necessary to contest a claim of small amount when vital issues and conceivably profound precedents are at stake. *Church of Scientology* v. *United States,* 485 F. 2d 313 (CA9 1973), illustrates the Government's effort to win dismissal of a case when a refund had been made. See also *Mitchell* v. *Riddell,* 402 F. 2d 842 (CA9 1968), appeal dismissed and cert. denied, 394 U. S. 456 (1969). There is little doubt that the Commissioner possesses the authority to make the refund and moot the suit if he chooses not to litigate the underlying issues. Although I agree with the Commissioner

---

sue arises. Ordinarily, it would take much longer for the case of the organization's status to be tried." 34 J. of Taxation 168.

The former Commissioner also made significant remarks with respect to the need for judicial determination of issues involved in this case that will be precluded by the Court's interpretation of § 7421:

"This is an extremely unfortunate situation for several reasons. First, it offends my sense of justice for undue delay to be imposed on one who needs a prompt decision. Second, in practical effect it gives a greater finality to IRS decisions than we would want or Congress intended. Third, it inhibits the growth of a body of case law interpretive of the exempt organization provisions that could guide the IRS in its further deliberations." *Ibid.*

that to do so in a situation like that in the instant case would amount to bad faith, Brief for Petitioner 35 n. 25, it would be almost impossible for an organization to prove bad faith where, as here, the sum at issue is minimal and inadvertence or sound administration could be a valid reason for the refund.

Additionally, there is a substantial question whether an organization's eventual victory in a refund suit would accomplish its goal. The Commissioner has asserted that "normal practice is to issue a favorable ruling upon the application of an organization which has prevailed in a court suit," Reply Brief for Petitioner 34–35, n. 31. Still, the IRS Exempt Organizations Handbook states:

> "An organization which obtains a Tax Court or Federal court decision holding it to be exempt must file an exemption application and establish its right to exemption before the Service will recognize its exemption for years subsequent to those involved in the court decision." Department of Treasury, Internal Revenue Manual, Part XI, c. (11) 671, ¶ 270.

Whatever the internal practice may be, the published procedures cast serious doubt on the adequacy of the refund suit to resolve the organization's urgent problem. The revenue ruling has prospective application, whereas a court determination operates retrospectively to the extent the pleadings and proof and the applicable statute of limitations permit.[15] Thus, the scope of relief available in a refund suit is also uncertain. The orga-

---

[15] See Note, Procedural Due Process Limitations on the Suspension of Advanced Assurance of Deductibility, 47 S. Cal. L. Rev. 427 (1974), for a detailed discussion of constitutional considerations of IRS letter-ruling revocation without a hearing.

nization is then faced with the dilemma of choosing between a so-called pre-assessment suit, which the Court says it cannot bring, and a refund suit that decides little more than the correctness of a particular year's tax liability (which in this case has been paid and is of little or no concern).

The staged suit by a "friendly" donor is the Commissioner's other suggestion. The donor's suit suffers the same time problems. The organization is off the Cumulative List at least until the donor establishes his entitlement to a §§ 170 (a)(1) and (c)(2)(D) deduction. This suit also may be mooted. Moreover, litigation by the accommodating donor does not permit the organization to assert its rights and interests. Could the donor make the First Amendment and equal protection claims that AU seeks to have determined? Not only must AU rely on a contributor to raise issues for it, but it must find a donor who is willing both to contribute and to undertake the task of litigation. This strains largesse to the extreme, particularly since the suit will subject the donor to routine full audit of his own return.

I conclude that neither course is an adequate remedy for an irreparably harmed organization to vindicate its claims.[16] Thus, equitable relief in the form of an injunction is not inappropriate.

---

[16] The contention that the remedies suggested by the Commissioner are inadequate is supported by most of the commentators who have addressed the issue since these cases were decided in the Courts of Appeals. See Note, Constitutional Implications of Withdrawal of Federal Tax Benefits From Private Segregated Schools, 33 Md. L. Rev. 51, 53 (1973); Note, The Loss of Privileged Tax Status and Suits to Restrain Assessments, 30 Wash. & Lee L. Rev. 573, 590 (1973); Comment, Avoiding the Anti-Injunction Statute in Suits to Enjoin Termination of Tax-Exempt Status, 14 Wm. & Mary L. Rev. 1014, 1025 (1973); Recent Development, 73 Col. L. Rev. 1502, 1513–1514 (1973); Notes, 46 Temp. L. Q. 596, 601 (1973).

## IV

The last issue is whether the amended complaint presented a substantial constitutional question on the merits justifying the convening of a three-judge court under 28 U. S. C. § 2282. The test was enunciated in *Ex parte Poresky,* 290 U. S. 30, 32 (1933), and restated in *Goosby* v. *Osser,* 409 U. S. 512, 518 (1973), and in *Hagans* v. *Lavine,* 415 U. S. 528, 542–543 (1974). The Court of Appeals in the present case said that "the possibility of success is not so certain as to merit the *Enochs* exception with respect to § 7421 (a), yet not so frivolous or foreclosed as to merit denial of the § 2282 motion." 155 U. S. App. D. C., at 298, 477 F. 2d, at 1183. I do not differ with that determination.

I, of course, imply no opinion on the merits of the underlying controversy.

Since I cannot join the Court's reversal of the Court of Appeals' judgment, I respectfully dissent.