INVESTMENT ANNUITY, INC., et al.

v.

W. Michael BLUMENTHAL as Secretary of the Treasury of the United States et al., Appellants.

No. 78–1106.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 1979.

Decided Oct. 5, 1979.

Richard Farber, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Leonard J. Henzke, Jr., Attys., Dept. of Justice, Washington, D. C., were on brief, for appellants; Earl J. Silbert, U. S. Atty., Washington, D. C., of counsel.

William L. Goldman, Washington, D. C., with whom Herbert L. Awe, Washington, D. C., on brief, for appellee First Inv. Annuity Co. of America.

Arthur P. Hartel, Jr., was on brief, for appellee Inv. Annuity, Inc.

Before WRIGHT, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

**LEVENTHAL, Circuit Judge:**

The Internal Revenue Service (IRS) appeals orders of the district court that granted to marketers of investment annuities a judgment declaring erroneous the statutory interpretation contained in Revenue Ruling 77–85[1] and enjoining IRS from applying it to purchasers of investment annuities. Because we find that the Anti-Injunction Act[2] and the tax exception to the Declaratory Judgment Act[3] bar the relief awarded by the district court, we reverse.[4]

## I. BACKGROUND

The purchaser (or policyholder) of an annuity buys from an insurance company the right to receive periodic payments beginning at a specified date (often the purchaser's anticipated retirement age) and continuing as long as the policyholder lives. Under a fixed dollar annuity, the policyholder receives a sum certain. Under a variable annuity, the amount of payment varies depending on the investment performance of assets held in a "segregated asset account" rather than in the insurance company's general asset account. A form of variable annuity, the investment annuity's salient characteristics, and the ones that occasion the instant controversy, are (1) provision for substantial direction by the policyholder over the investment of assets contained in the segregated account or "custodial account," and (2) its guarantee of liquidity.[5]

1. Revenue Ruling 77–85 reversed, prospectively, the prior administrative practice of IRS according favorable tax treatment to purchasers of "investment annuities." 1977–1 Comm.Bul. 12.

2. Internal Revenue Code of 1954, § 7421(a), 26 U.S.C. § 7421(a) (1976).

3. 28 U.S.C. § 2201 (1976).

4. We therefore reach no decision on the merits, except as necessary to dispose of one exception to the Anti-Injunction Act.

5. More specifically, the investment annuity operates as follows. An investment annuity contract establishes a "custodial account" with a third party, usually a bank, into which the policyholder pays a minimum amount (in cash or by the transfer of other assets) that he may supplement at any time up to the "starting date" of the annuity. The assets in the account are nominally the property of the insurance company, as they are pledged to the purchase of an annuity. The company also receives a percentage of the assets annually as a premium on an annuity policy, and any assets remaining in the account at the policyholder's death as a "terminal premium." The assets in the account are invested at the direction of the policyholder. While investment options are limited to those on an "approved list," such lists normally include publicly-traded securities, government obligations, certificates of deposit, savings accounts, commercial paper, and life insurance. The policyholder may at any time direct the custodian to sell, purchase or exchange assets held in the account, and to

The substantive issue presented is whether investment annuities are "contracts with reserves based on a segregated asset account" within the meaning of section 801(g)(1)(B) of the Internal Revenue Code.[6] If they are, income generated by the assets held in the custodial account is taxed to the insurance company at the nominal rates applicable to them. If they are not, the income is currently taxable to the policyholder.

Beginning in 1965, IRS, in a series of private letter rulings directed to individual policyholders and to appellees,[7] took the position that income generated by the assets held in custodial accounts was taxable to the insurance company, not the policyholder. The theory was that the company, not the policyholder, "owed" the assets. Sales of the contracts, initially modest, mushroomed when business and financial publications heralded them as permitting taxpayers to avoid taxation on investment earnings while retaining control and liquidity.[8] IRS undertook a reconsideration of its position, eventually reversing it in Revenue Ruling 77–85. IRS concluded that retention of substantial incidents of ownership made the policyholder the "owner" of the assets for tax purposes, thereby removing the investment annuity from section 801(g)(1)(B) and making the income currently taxable to the policyholder. In view of policyholders' reliance on IRS's earlier determinations, however, IRS "grandfathered" existing contracts, applying its ruling only to new accounts or to existing accounts to which a contribution was made after March 9, 1977.

In conjunction with the IRS ruling, state regulatory authorities and the Securities and Exchange Commission (SEC) rescinded their earlier, favorable determinations on the investment annuities marketed by appellees. This effectively prohibited further marketing by appellees, and no investment annuities have been sold by appellees, nor have additional contributions to existing accounts been made, since March 9, 1977.

After failing in a bid for congressional intervention, appellees brought this action, seeking declaratory and injunctive relief. The government moved to dismiss on the ground that the Anti-Injunction Act and the tax exemption to the Declaratory Judgment Act deprived the district court of jurisdiction.[9] Appellees countered that because IRS had "grandfathered" existing contracts and because further sales were infeasible, the legality of the IRS's ruling would otherwise escape judicial review, as

reinvest income. The policyholder also retains the power to direct the voting of the securities or to exercise any other rights pertaining to the assets. While the assets contained in the custodial account may not be returned directly to the policyholder, full or partial redemption of the annuity policy may be had prior to the starting date. In such a case, the custodian sells the assets and pays the proceeds over to the insurance company, which in turn pays them to the policyholder, less any cash surrender charges. Should the policyholder die before the starting date, the custodial account is liquidated and the proceeds paid to the policyholder's beneficiaries in the same manner. J.A. at 139–142.

6. 26 U.S.C. § 801(g)(1)(B) (1976).

7. Appellee Investment Annuity, Inc.'s only business was the ownership of the shares of First Investment Annuity Company of America (FIAC), which engaged solely in the sale of investment of annuities. Following the government's notice of appeal, Investment Annuity sold FIAC to INA Corporation. Except where otherwise noted, we refer collectively to "appellees."

8. The advantages were twofold. First, because income from assets held by insurance companies is subject to only nominal taxation, the overall after-tax return on the investment (though offset somewhat by fees to the custodian and insurance company) would, as a result of compounding, be significantly greater than if currently taxed to the policyholder. Second, realization of the income was deferred to a time (e. g., after retirement) when the policyholder would likely occupy a lower tax bracket. These advantages, combined with the retained control over the investment, prompted the financial press to dub the investment annuity the "wrap-around" annuity, because it permitted investors to defer current income merely by "wrapping" an annuity around an existing investment.

9. The district court rejected the government's claim of lack of standing, and the government has not pursued the point on appeal.

there would be no opportunity to test in a taxpayer suit for refund.

The District Court agreed with appellees that the pertinent provisions were not "intended to preclude pre-enforcement review of Service actions where the action will otherwise *never* be subject to judicial review." J.A. at 175. However, in an order of July 12, 1977, the district court initially refused to maintain the action until appellees demonstrated that they had made "all good-faith efforts to stage a 'friendly' third-party challenge to Revenue Ruling 77–85." *Id.* at 173. The court anticipated the sale of one more investment annuity to a cooperative taxpayer, who could then challenge Revenue Ruling 77–85 in a refund suit. When the state authorities and the SEC declined to accede to this procedure by approving such a sale, the district court, on September 28, 1977, held that no third party investment was feasible and denied the government's motion to dismiss. On November 9, 1977, the court issued a memorandum opinion and order declaring Revenue Ruling 77–85 invalid, and subsequently entered further relief, enjoining the government from applying the ruling to the extent it would increase the tax liability of investment annuity purchasers.[10]

## II. ANALYSIS

We do not pass on the merits of appellees' claim, for we conclude that this action is barred by the Anti-Injunction Act and the tax exemption to the Declaratory Judgment Act. The Anti-Injunction Act provides unequivocally:

No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.[11]

The language of the Declaratory Judgment Act exempting all suits "with respect to federal taxes"[12] is, if anything, more restrictive. However, since we have held that the reach of the two Acts is coterminous,[13] our analysis focuses on the Anti-Injunction Act.

At the outset, we reject appellees' contention that the Anti-Injunction Act does not apply because this is not a "suit for the purpose of *restraining* the assessment or collection of any tax." Their theory is that there is no interference with the collection of revenue: appellees' tax liability will increase as the income from the property held in the segregated accounts is attributed to them; present policyholders have been "grandfathered;" and no further sales of investment annuities have occurred since IRS's March 9, 1977, ruling. However, appellees' theory is undercut by their own action in seeking, and obtaining, relief in the form of an injunction against taxing policyholders on the income from investment annuity accounts. That the suit has had no current effect on the collection of taxes is of no import, for its "purpose" is clearly restraint. If appellees were to prevail in this court, they surely would reinstitute sales of investment annuities. In that event, the district court's order would operate to prevent IRS from assessing and col-

10. Appellees also sought an injunction requiring that, even if the government prevailed on appeal, it would nevertheless be required to afford favorable treatment to income arising from contributions made after March 9, 1977 and before resolution of the appeal. When the district court failed to provide such relief in its order of November 9, 1977, appellees filed a motion to it in this court. It was denied on December 9, 1977. The district court's order of December 8, 1977, expressly provided for retroactive assessment of taxes in the event of a successful appeal by the government.

11. *Internal Revenue Code* of 1954, § 7421(a), 26 U.S.C. § 7421(a) (1976). The section does contain certain express exceptions, not here relevant.

12. 28 U.S.C. § 2201 (1976).

13. *Eastern Ken. Welfare Rights Org. v. Simon*, 165 U.S.App.D.C. 239, 244–46, 506 F.2d 1278, 1283–85 (1974), *rev'd on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *"Americans United" Inc. v. Walters*, 155 U.S. App.D.C. 284, 290–91, 477 F.2d 1169, 1175–76 (1973), *rev'd on other grounds*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974); *accord, McGlotten v. Connally*, 338 F.Supp. 448, 452–53 (D.D.C.1972) (three-judge court).

lecting taxes called for by Revenue Ruling 77–85.[14]

In recent years, Supreme Court decisions examining the Anti-Injunction Act have drummed its central purpose: to protect the government's ability to assess and collect taxes free from pre-enforcement judicial interference by confined taxpayers seeking review to refund actions.[15] To this end, the Court has given the Act "almost literal effect,"[16] without regard to the harshness of the result.

In *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), the court concluded that the Act permitted relief from its strictures *only* where (1) the government could "under no circumstances" ultimately prevail, and (2) where equity jurisdiction was otherwise present. *Id.* at 7, 82 S.Ct. 1125. A claim that irreparable injury would result from the collection of the tax was not sufficient to overcome the Act's prohibition, since such a showing, necessary to invocation of equity jurisdiction, satisfied only one prong of the test. Thus, the Court was unmoved by the claim that the challenged collection of taxes could bankrupt it.

In *Bob Jones University v. Simon*, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), the Court rejected a contention that there were judicially-created exceptions to the Act other than the "under no circum-

stances" test. *Williams Packing*, the Court stressed,

> was meant to be the capstone to judicial construction of the Act. It spells an end to a cyclical pattern of allegiance to the plain meaning of the Act, followed by periods of uncertainty caused by a judicial departure from that meaning, and followed in turn by the Court's redisclosing of the Act's purpose.

*Id.* at 742, 94 S.Ct. at 2048. In *Bob Jones University* and a companion case, *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974), charitable organizations had sought to contest the revocation of their tax-exempt status prior to the assessment of taxes against them. Though recognizing that the denial of tax-exempt status threatened the flow of contributions to the charities, the Court declined to depart from the dual test of *Williams Packing*.

In the instant case, appellees did not seek to persuade the district court that their case came within the *Williams Packing* exception. J.A. at 174. While appellee Investment Annuity, Inc., makes that contention on appeal, it has failed to meet its burden of demonstrating that, at the time suit was commenced, the government could "under no circumstances" ultimately prevail. This is not a case in which IRS flouted the express terms of the Code,[17] or lacked any

---

**14.** Appellees rely on *Eastern Ken. Welfare Rights Org. v. Simon*, 165 U.S.App.D.C. 239, 245, 506 F.2d 1278, 1284 (1974), *rev'd on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and *McGlotten v. Connally*, 338 F.Supp. 448, 453–54 (D.D.C.1972) (three-judge court). Those cases are easily distinguishable. In them, the plaintiffs sought to compel IRS to rescind tax-exempt status accorded certain organizations. Because the government would have been required to levy taxes on previously tax-exempt organizations, it was held that the Anti-Injunction Act did not apply. The effect of the decree was to increase the amount of taxes payable. The effect of the decree sought and obtained by appellees was to reduce the total amount of taxes payable, and was plainly a direct restraint on the government's ability to collect taxes.

**15.** *Bob Jones University v. Simon*, 416 U.S. 725, 736–37, 94 S.Ct. 2038, 40 L.Ed.2d 496

(1974); *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). The Court has also identified a "collateral objective of the Act—protection of the collector from litigation pending a suit for refund." *Williams Packing, supra*, at 7–8, 82 S.Ct. at 1129 (quoted in *Bob Jones University, supra*, 416 U.S. at 737, 94 S.Ct. 2038); *see also Commissioner v. Shapiro*, 424 U.S. 614, 628–29, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976).

**16.** *Bob Jones University v. Simon*, 416 U.S. 725, 737, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

**17.** *E. g., Miller v. Standard Nut Margarine Co.*, 284 U.S. 498, 52 S.Ct. 23, 76 L.Ed. 517 (1932); *see Bob Jones University v. Simon*, 416 U.S. 725, 744–46, 94 S.Ct. 2038, 40 L.Ed.2d 496; *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962).

factual basis for the assessment of taxes against an individual taxpayer.[18] Rather, the propriety of IRS's treatment of investment annuities was "sufficiently debatable" to preclude the showing of certain success requisite to invocation of the *Williams Packing* exception.

The principal contention of the appellees is that an exception to the Anti-Injunction Act exists where the practical effect of applying the Act would be to foreclose all judicial review of the challenged action. The district court agreed. Finding that no person could raise the validity of Revenue Ruling 77–85 in a refund suit, the district court held that the Act did not apply and proceeded to reach the merits.

Appellees, and the district court, draw their inspiration from dictum in *Bob Jones University, supra.* The Supreme Court did state: "This is not a case in which an aggrieved party has no access at all to judicial review. Were that true, our conclusion might well be different." 416 U.S. at 746, 94 S.Ct. at 2050. The government counters appellees' thesis by arguing that *United States v. American Friends Service Committee*, 419 U.S. 7, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974), stands for the proposition that the Anti-Injunction Act bars a tax suit even where an aggrieved party is, by operation of the Act, denied all access to judicial review.

While Justice Douglas' dissent in *American Friends*, 419 U.S. at 14 n.3, 95 S.Ct. 13, did accuse the majority of deciding *sub silentio* the issue left open by the dictum in *Bob Jones University*, the majority evidently did not view the case as one in which plaintiffs were denied access to judicial review. The Court emphasized that ". . . the employees will have a 'full opportunity to litigate' their tax liability in a refund suit." 419 U.S. at 11, 95 S.Ct. at 15 (cita-

tion omitted). In view of the Court's different perception, we reject the government's argument that *American Friends* resolves the question left open in *Bob Jones University.*

■ Read broadly, however, *American Friends* does reinforce the message of *Williams Packing* and its progeny that the Act's bar is not lightly to be overcome. The clear meaning of *Bob Jones University's* reference to *Williams Packing* as the "capstone" of judicial construction under the Act is that *Williams Packing* defines the sole basis for judicially-created exceptions to the Act. As a result, we cannot agree with appellees and the district court that the Act and the pertinent precedents countenance a general exception *wherever* a matter will otherwise escape judicial review.[19]

■ Nevertheless, the Act must yield when the denial of judicial review rises to the level of a constitutional infirmity. This narrower "exception," not judicially inferred from the statute, but having constitutional roots, may be the implication of the *Bob Jones University* decision. While the Court barred the further fashioning of statutory exceptions, it did not deny the relevance of due process concerns. The Court's reference to "a case in which an aggrieved party has no access at all to judicial review" came in the context of its discussion of the University's claim that postponement of its challenge to the revocation of its tax-exempt status would violate due process. As to this claim, the Court held that the "problems presented do not rise to the level of constitutional infirmities, in light of the powerful governmental interests in protecting the administration of the tax system from premature judicial interference." 416 U.S. at 747, 94 S.Ct. at 2051. We take the

---

18. *See Commissioner v. Shapiro*, 424 U.S. 614, 624–28, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976).

19. *Eastern Ken. Welfare Rights Org. v. Simon*, 165 U.S.App.D.C. 239, 506 F.2d 1278 (1974), *rev'd on other grounds*, 426 U.S. 26, 96 S.Ct. 1917 (1976), does not preclude our result. The court there did rely on the lack of an "adequate legal remedy" to find that the Act did not

apply. *Id.* at 245, 506 F.2d at 1286. But the basis of our holding in that case was that because the action was, in effect, one to require the collection of taxes by removing the tax-exempt status of certain organizations, the suit fell outside the Act altogether. *See* note 14 *supra.*

Court's dictum as a recognition that the denial of all access to judicial review, as opposed to its postponement, might rise to the level of a constitutional infirmity. But in this, the Court merely reflected established doctrine that a taxpayer may not, consistently with due process, be denied the opportunity for an ultimate judicial determination of the legality of a tax assessment against him.[20] Congress may in some cases restrict judicial review of administrative action, even though the results may have a detrimental impact on their subjects.[21] And, it is clear that not all denials of access to judicial review amount to due process violations.[22]

In view of the unambiguous language of the Act, and the Supreme Court's strict interpretation, any "exception" to the Act necessary to conform it to constitutional standards must be carefully tailored to achieve that end while preserving to the maximum extent the statutory purpose. The Court's recognition in *Bob Jones University* that the complete denial of access to judicial review may implicate due process concerns provides no basis for crafting an exception in a case where the denial does not amount to a violation of due process.

■ Here, the injury caused by the shift in IRS's interpretation of the pertinent statute—a detrimental impact on appellees' business—does not invade any property interest cognizable under the due process clause. The challenged government action concerned the tax liability of investment annuity purchasers; it did not require appellees to pay taxes and hence there was no government action that directly deprived them of property. Deprivation of property underlies the long-recognized right of taxpayer to judicial review of the assessment of taxes.[23] Nor did the earlier private letter rulings on which appellees relied in building their business create any "legitimate claim of entitlement."[24] Such rulings express the Commission's interpretation of the law at the time they are given, and may be taken into account subsequently, but they do not have the force of law and do not bind the Commissioner to adhere to the same position in the future.[25]

■ The fact that the government threatens to deprive a person of his property (by a tax assessment) may have pecuniary impact on a variety of other persons whose fortunes are in one way or another linked to him—his family, suppliers, prospective donees (*e. g.* colleges hoping for alumni contributions) and prospective co-venturers. In some instances the impact may be sufficient to establish that they are "adversely affected" or "aggrieved" for purposes of ordinary doctrine establishing judicial review of agency action.[26] But unless the persons are deprived of their own property, or a common law or statutory

---

**20.** *Phillips v. Commissioner,* 283 U.S. 589, 596–97, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931) (Brandeis, J.) ("Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate.").

**21.** *E. g., Southern Ry. Co. v. Seaboard Allied Milling Co.,* —— U.S. ——, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979) (ICC decisions not to investigate proposed rates); *Arrow Transp. Co. v. Southern Ry. Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963) (ICC suspension decisions).

**22.** *E. g., DeRodulfa v. United States,* 149 U.S. App.D.C. 154, 170–72, 461 F.2d 1240, 1256–68, cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972) (veterans' benefits).

**23.** In *Phillips v. Commissioner,* 283 U.S. 589, 596–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (quoted in note 20 *supra* ), the reference to taxpayer's ultimate opportunity for judicial review is in the context that "property rights are involved."

**24.** *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

**25.** *See Dixon v. United States,* 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *Wisconsin Nipple & Fabricating Corp. v. Commissioner,* 581 F.2d 1235 (7th Cir. 1978).

**26.** 5 U.S.C. § 702 (1976).

right, there is no basis for a claim that government has "deprived" them of property.[27]

■ Our opinion assumes that the district court was correct in its premise, not challenged here, that no alternative methods of judicial review were available. Whether or not this premise stands,[28] the court is without jurisdiction to provide the relief sought or granted.

Though this case involves the special statutory provisions relating to tax, a useful perspective is provided by considering it in the more general context of judicial review of agency activity. The "generous" provisions of the Administrative Procedure Act for judicial review [29] have been held to embody a presumption in favor of judicial review that extends—assuming hardship, ripeness and suitability for judicial resolution—even to pre-enforcement actions for injunction or declaratory judgment.[30]

■ The presumption of reviewability of administrative action is subject to exceptions: "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." There are only a handful of instances where a statute has expressly precluded judicial review,[31] although on occasion the Court has discerned an implied statutory preclusion of review.[32] The exemption for "action committed to agency discretion by law" has been construed narrowly—for cases where there is no law to apply [33] or for extraordinary circumstances, such as those requiring flexibility in managing the resources of national defense.[34]

In the tax field there is quintessentially law to apply, and no claim of total withdrawal of issues from judicial review. There are, however, important statutory limitations. Perhaps the extreme case was put by the provision that where there is reason to believe that the assessment or

---

**27.** *Roth v. Board of Regents,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1974); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**28.** The Pennsylvania Insurance Commissioner refused to approve an additional sale or contribution, even for the purpose of permitting a test case. The SEC declined to issue a "no-action" letter in view of the Insurance Commissioner's action. But the Commissioner's decision was premised on an evaluation that the public interest would best be served by a speedy resolution in the district court. In light of our ruling, the Commissioner may choose to modify his assessment and allow a test case to proceed.

**29.** *See e. g.,* 5 U.S.C. §§ 701, 702 and 706.

**30.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Curran v. Laird,* 136 U.S.App.D.C. 280, 420 F.2d 122 (1969) (en banc).

**31.** *E. g.* the prohibition of judicial review when the I.C.C. has refused to exercise its statutory authority to suspend a rate change for a limited time. *United States v. Students Challenging Regulatory Agency Procedures* (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Arrow Transportation v. Southern Railway Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

**32.** *See e. g., Switchmen's Union of North American v. National Mediation Board,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), wherein the Court discerned a Congressional intent to make agency certification of a collective bargaining representative "the last terminal point," with "no dragging out of the controversy into other tribunals of law." 320 U.S. at 305, 64 S.Ct. at 99. While the *Switchmen's* Court made much of the fact that the agency was doing nothing more than making a finding of fact and that it was not issuing a directive, the statute itself contained the directive; thus, the "finding of fact" was virtually conclusive as to outcome. Nonetheless, even in this context, the Court was unwilling to review agency action where it detected an intent of Congress to preclude such review.

**33.** *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

**34.** *Curran v. Laird,* 136 U.S.App.D.C. 280, 420 F.2d 122 (1969). The courts will not examine the agency's action in this "narrow band of matters that are wholly committed to official discretion, and that the inappropriateness or even mischief involved in appraising a claim of error or of abuse of discretion, and testing it in an evidentiary hearing, leads to the conclusion that there has been withdrawn from the judicial ambit any consideration of whether the official is arbitrary or constitutes an abuse of discretion. . . ." *Id.*

collection of taxes might be endangered by delay, the Commissioner of Internal Revenue may, pursuant to statutory authority and without fear of judicial disapproval, make an immediate jeopardy assessment and require the taxpayer to forward payment or post a bond.[35] This is evocative of the special problems posed by statutory provisions for the summary seizure, condemnation, and destruction of unwholesome food.[36]

Apart from such extreme instances, the tax field is marked by the general preclusion of advance declaratory or injunctive relief.[37] Even here, the Court has interposed judicial provenance for cases where the agency strays palpably off the track. This is very like what it has done for cases where judicial review was entirely prohibited,[38] and it identifies a special enclave in administrative law that hearkens to mandamus and the power to enforce "ministerial" duties in case of "clear error." But such review is reserved for cases "so plainly beyond the bounds . . . as to warrant the immediate intervention of an equity court."[39]

The court respects the need not to interrupt the flow into the public trove of the tax dollars that are the life-blood of the national government. A "peek at the merits" may guide the judge in determining whether there is available the jurisdiction for clear deviations from legislative instruction,[40] for "[t]he reconciliation of doctrine lies not in concept but in practicalities." [41]

For most tax issues and most taxpayers, a subsequent action for refund adequately safeguards all appropriate concerns.[42] The problem posed to plaintiffs/appellees is that they do not have sole control over their prospective cause of action.[43] The state regulatory authorities and the Securities and Exchange Commission must cooperate by reinstating their earlier favorable determination on the investment annuities marketed by appellees if the cause of action is to materialize. In this important respect, the appellees share the management of their business with the government.

This is not a situation where there are no remedies, however. Congress keeps a watchful eye on developments in the tax field, and will listen to citizens with a grievance or plea. It is not necessary for Congress to effect a substantive change in the law. It might, if so disposed, provide the appellees and similarly situated parties with

---

**35.** *Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 595 & 596 n.6, 51 S.Ct. 608, 75 L.Ed. 1289 (1930).

**36.** *North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908). The Court stated that the ex parte decision of the health officer might be challenged in a subsequent action for damages.
  *See also Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of mislabeled vitamins).

**37.** The Anti-Injunction Act and the tax exception to the Declaratory Judgment Act discussed above are just two examples of statutory preclusions in the tax field. *See also Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1930).

**38.** In this sense, *Switchmen's, supra* note 6, has been comprised by *Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958) (permitting a district court action contesting an NLRB certification determination): "This suit is not one to 'review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather, it is one to strike down an order of the Board made in excess of its delegated powers . . . ."

**39.** *Local 130, Int'l Union of Elec., Radio & Machine Workers v. McCulloch,* 120 U.S.App.D.C. 196, 201, 345 F.2d 90, 95 (1965).

**40.** *Cf. International Bhd. of Team. v. Brotherhood of Rail., A.&S. Cl.,* 131 U.S.App.D.C. 55, 64, 402 F.2d 196, 205 (1968).

**41.** *Id.*

**42.** *Phillips v. Commissioner,* 283 U.S. 589, 595, 51 S.Ct. 608, 75 L.Ed. 1289 (1930).

**43.** Appellees' problem in this regard is not unique. It might be compared, for instance, to the plight of a party to a proposed corporate reorganization whose partner does not wish to proceed. *See e. g. Price v. Gurney,* 324 U.S. 100, 107, 65 S.Ct. 513, 89 L.Ed. 776 (1944).

a remedy. Thus the Revenue Act of 1978 made declaratory judgment available to prospective issuers of certain governmental obligations.[44] Such issuers previously had found themselves in the same position in which the appellees find themselves now. Section 7478 was added to the Code to give the issuers an action for a declaration as to the status of the prospective obligations.[45]

So far as judicial remedies are concerned, however, in the absence of constitutional impediment, and we see none, this court must respect the limits placed by Congress on its jurisdiction.

The orders of the district court are reversed, and the case is remanded with instructions to dismiss the complaint for lack of jurisdiction.

*So ordered.*

44. Internal Revenue Amendments, Pub.L.No. 95–600, § 7478, 92 Stat. 2841, 2841–42 (1978) (codified in I.R.C. § 7478).

45. The legislative history of § 7478 illuminates the relationship of the "aggrieved" parties in the two cases the Senate Finance Committee reported in that case:

> As a practical matter, there is no effective appeal from a Service private letter ruling (or failure to issue a private letter ruling) that a proposed issue of municipal bonds is taxable. In those cases, although there may be a real controversy between a State or local government and the Service, present law does not allow the State or local government to go to court. The controversy can be resolved only if the bonds are issued, a bondholder excludes interest on the bonds from income, the exclusion is disallowed, and the Service asserts a deficiency in its statutory notice of deficiency. This uncertainty coupled with the threat of the ultimate loss of the exclusion, invariably makes it impossible to market the bonds. In addition, it is impossible for a State or local government to question the Service rulings and regulations directly.
>
> The committee believes that a State or local government should have a right to court adjudication in the situation described above. The bill deals with the problem by providing that, in the event of an unfavorable private letter ruling (or failure to issue a ruling), the State or local government may ask the Tax Court . . . for a declaratory judgment as to the tax status of a proposed issue of municipal bonds.

S.Rep.No.95–1263, 95th Cong., 2nd Sess., at 533–34 (1978), U.S.Code Cong. & Admin. News 1978, p. 6761.