FIRST LIBERTARIAN CHURCH, AN UNINCORPORATED ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1727–78X.      Filed May 27, 1980.

*Linda T. Abrams,* for the petitioner.
*Bernard B. Kornmehl,* for the respondent.

OPINION

STERRETT, *Judge:* Respondent determined that petitioner is not entitled to exemption from Federal income tax as an organization described in section 501(c)(3), I.R.C. 1954. On January 26, 1975, petitioner filed an "Application for Recognition of Exemption" under section 501(c)(3). By letter dated March 9, 1976, respondent made a preliminary determination denying recognition of the desired exempt status under section 501(c)(3). Petitioner protested that denial but, after further proceedings, received a final adverse determination by letter dated November

18, 1977, in which respondent finally denied the request for exemption. Petitioner challenges this final determination and invokes the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.[1] The issue is whether petitioner is operated exclusively for religious purposes within the meaning of section 501(c)(3). The case was submitted for our decision under Rule 122, Tax Court Rules of Practice and Procedure.

Before stating the facts appearing in the administrative record which are relevant to our decision herein, we must note the rather extraordinary procedural history of this case. In adding section 7428 to the Code,[2] Congress was reacting, at least in part, to the holdings by the Supreme Court in *Bob Jones University v. Simon,* 416 U.S. 725 (1974), and *Alexander v. "Americans United" Inc.,* 416 U.S. 752 (1974). In those cases, the Supreme Court held that an organization could not obtain the assistance of the courts to restrain the Internal Revenue Service from withdrawing a favorable ruling that the organization was exempt. See H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 701, 975.

In response to the enactment of section 7428 and the other declaratory judgment sections and, in response to the specific direction of Congress, H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, 979, 980, we promulgated certain rules of court. Title XXI, Tax Court Rules of Practice and Procedure. By these rules, we indicated that the declaration authorized by section 7428 will "ordinarily" be made by this Court on the basis of the submissions to the Internal Revenue Service contained in the "administrative record." We stated our belief that rarely, if ever, will a declaratory judgment action in this Court, with respect to the original qualification of an organization, involve a trial de novo and only then to resolve disputes with respect to jurisdictional facts and the contents of the administrative record. *Houston Lawyer Referral Service, Inc. v. Commissioner,* 69 T.C. 570, 577 (1978); Rule 217(a) and Note, Tax Court Rules of Practice and

---

[1]All the statutory prerequisites to our jurisdiction over this action have been satisfied: petitioner exhausted its administrative remedies, sec. 7428(b)(2); the petition was filed by the organization the qualification of which is at issue, sec. 7428(b)(1); petitioner mailed its petition before the 91st day after respondent mailed his final determination on this matter, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

[2]Sec. 7428 was added to the Code by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 1306, 90 Stat. 1717, 1976–3 C.B. (Vol. 1) 1, 193, effective Apr. 5, 1977, with respect to determinations made after Jan. 1, 1976.

Procedure, 68 T.C. 1048 (1977). Thus, in the usual case, the function of this Court in a declaratory judgment action is to adjudicate whether the Commissioner's determination was erroneous on the basis of the materials contained in the administrative record submitted by the applicant upon which the determination of the Commissioner was based, which material must be presumed to be true. *Houston Lawyer Referral Service, Inc. v. Commissioner, supra* at 575.

Unfortunately, the procedural development of the case before us did not progress in the expected or ususal manner. On December 20, 1978, respondent filed a notice of filing of the administrative record. In that document, respondent stated that he and petitioner had failed to agree with respect to the completeness of the administrative record and that he was, therefore, filing the attached administrative record pursuant to Rule 217(b), Tax Court Rules of Practice and Procedure. Petitioner responded on March 12, 1979, with a motion to strike specified portions of the answer and of respondent's proposed administrative record. By this motion, petitioner requested that the Court strike from the administrative record, as filed by respondent, certain documents which it had allegedly not filed, documents which allegedly did not relate to petitioner, and documents which petitioner had had no opportunity to contest or rebut.

At the hearing on the motion, it was established through testimony that a variety of documents in the administrative record had, indeed, not been submitted by petitioner and did not relate to petitioner. Rather, at least several of the documents in the record had been submitted anonymously by the irate wife of one of petitioner's founders. It appearing impossible to determine which of the many documents and duplicate documents in the record were the offending ones, we decided to open the record. Thus petitioner was allowed 45 days to submit additional or rebuttal documents to the record, respondent was given 60 days thereafter to file any documents it wished to file, and petitioner had 30 days thereafter to respond. After certain extensions of time were granted, the parties filed their submission and supplemental stipulation of additional documents, pursuant to this Court's order, on December 10, 1979.

It is unfortunate that the need to resort to such an ad hoc procedure should be imposed upon the Court and the parties by

the unauthorized acts of a person totally collateral to these proceedings. However, when an instance occurs in which there is no applicable rule of procedure, the Court must prescribe the procedure necessary to secure the just, speedy, and inexpensive determination of the case. Rule 1, Tax Court Rules of Practice and Procedure. Our oral order of May 16, 1979, was designed to, and we believe did, elicit the full and fair disclosure of all the facts respecting petitioner's organization and operation. No objection to this procedure appearing from either party, we think it appropriate to proceed treating the statements contained in the administrative record as supplemented as true, and in all other respects treating the action as a typical declaratory judgment action.

Petitioner First Libertarian Church (the church) is an unincorporated association organized in Los Angeles, Calif., on January 21, 1975. Petitioner's principal meeting place was in Los Angeles, Calif., at all times relevant hereto. The church was founded by Richard W. Grant (Grant), Charles R. Estes (Estes), and Lloyd M. Licher (Licher), all of whom also served as petitioner's initial officers: Grant, as presdient; Estes, as vice president; and Licher, as secretary-treasurer.

The central doctrine of the church is "ethical egoism" or, in more general terms, "voluntarism." Ethical egoism encompasses the idea that the individual has a right to live his own life, for his own sake, and in accordance with his own convictions, and without coercion from outside sources. It is not the purpose of the church to promote a particular "code of morals" but rather to uphold for the individual his right, in an ethical sense, to select his own values in accordance with his own convictions. The church's doctrine is nontheistic.

The church had its origins in the Libertarian Supper Club of Los Angeles (club). The club was established in January of 1972 by several University of Southern California students who considered naming it the First Tuesday Club after the day of the month it met. After the first few meetings of the club, Licher offered, and was given permission, to publish and mail newsletters covering the club's meetings. Further, after the first few meetings of the club, Licher assumed directorship of the meetings. Licher retained both posts until March of 1977 when he moved out of Los Angeles.

The church grew out of these club meetings which functioned

to bring like-minded persons together. When the church was founded in January 1975, it operated by way of these club meetings which, until April of 1976, served as both club and church meetings.

Starting in April of 1976, petitioner began to sponsor church meetings which were, at least formally, separate from the club meetings it was sponsoring. Just prior to a club dinner, the church would meet at the location of the dinner, i.e., at whatever restaurant or hall had been chosen for that evening, and church business would be conducted. The format of these church meetings included readings and contemplation from voluntarist literature, discussions of this literature, church announcements, and business. At no time was church membership required for attendance at the meeting or the subsequent supper. In May of 1975, the church assumed responsibility for publishing the club's newsletter. The primary activities of the church after April 1976, thus, were (1) conducting church meetings just before club meetings, (2) sponsoring a supper, (3) conducting club meetings (which until April 1976 were also church meetings and the sole manner in which the church manifested itself), and (4) publishing the club-church newsletter.

The operation of neither the club meetings nor the newsletter was much affected by the church takeover of each. Further, neither club nor newsletter was much affected by the April 1976 origination of formally separate church meetings. The following descriptions are, therefore, generally equally applicable to both the pre- and post-1975 operations of each.

*Club meetings.*—The distinguishing aspect of the club meetings was that almost every meeting involved the presence of a speaker invited to address the assembly. The speaker for any one meeting would be chosen by the director of the club based upon the availability of the speaker and the quality of the proposed speech. Often these persons speaking would discuss voluntarist topics. The typical evening of a club meeting would involve the following: First a meal would be served, the director would make opening remarks followed by an open announcements period in which any and all present could make whatever announcements they wished to make—often the announcements were political or commercial in nature—the speaker would be introduced and would make his presentation, the presentation would be followed by a question and answer and discussion

period, followed, perhaps, by closing remarks by the club's director. The club charged for the meal on, we assume, a cost basis. Clearly, it was not the intent of the club to make a profit on the meals, and often it incurred a loss when fewer than the number of expected persons purchased dinners. It was not necessary to eat a dinner to participate in the speech and discussion periods, and it was often the case that persons would arrive at the meeting after the dinner. The types of discussions at the various meetings were not necessarily religious. They ranged, for example, from a discussion of President Kennedy's assassination to voluntarist philosophy, to libertarian political topics.

*Newsletter.*—As noted, another primary function of the church was its publication of a newsletter. In the usual case, the director of the club (Licher, until 1977) would record the meeting and then summarize it, in some detail, in the newsletter which would be published and mailed prior to the next meeting. The average newsletter published after April 1975, when the church took over publication thereof would, therefore, contain an introductory section, a notice and brief description of the next dinner speaker and his topic, a "calender of events" noting the time and place of events likely to be of interest to the recipients of the letter, a summary of the events and discussions occurring at the dinner meeting, a section entitled "First Libertarian Church News," and perhaps, a collection of miscellaneous sections. Membership in the church was not a prerequisite to receiving the newsletter. To be included on the mailing list, however, required that one make a minimal donation to the church's postage fund.

At all times relevant, the church had an exchange arrangement with a variety of other publications and periodicals of libertarian content, including Region XLL of the Libertarian Party (Liberletter); Foundation for Economic Education; Libertarian Alternatives of San Diego (newsletter); Reason Magazine; Libertarian Review (magazine); and Libertarian Council of Churches (newsletter). The church would place copies of the documents received through this exchange arrangement in its library, which was kept in the home of the newsletter's editor, but which was available for perusal by interested parties.

At various times, the newsletter contained "flyers," i.e., single-page inserts advertising events. A party or group could

have a flyer included in the newsletter by paying 2 cents per insert. At all relevant times, the newsletter had a circulation of approximately 350 persons.

While holding church meetings, sponsoring suppers, club meetings, and the newsletter were the church's main activities during the years before us, the church also sponsored a libertarian arbitration service and a civil liberties council. The church conducted at least three "noncoercive" arbitrations between September 1975 and November 1977. While the civil liberties council was inactive during the times relevant hereto, it is intended that it will submit amicus curiae briefs and offer legal aid and assistance in selected cases where property rights are threatened by State action.

Respondent denied petitioner's application for exemption because he was unable to distinguish the church's operations from those of an action organization, because the church did not establish that it was organized and operated for religious purposes, and because the church did not establish that its purposes and activities were those of a church. Basically, it appeared to respondent that the church's "purposes and activities overlap both those of the Libertarian Party, whose purposes and activities appear to be political in nature, and those of the Libertarian Supper Club, whose purposes appear to be social in nature." Petitioner, on the other hand, argues that it is exempt under section 501(c)(3) as a religious organization. The burden is on petitioner with respect to all the grounds for respondent's adverse determination stated in his final determination letter. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure; *Sound Health Association v. Commissioner*, 71 T.C. 158, 176 (1978).

For an organization to be exempt from Federal income tax under sections 501(a) and 501(c)(3),[3] it must satisfy both the

---

[3] At all relevant times, sec. 501(c)(3) read as follows:

SEC. 501(c). LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a);

\*    \*    \*    \*    \*    \*    \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious \* \* \* purposes \* \* \* no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, \* \* \* and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

organizational and operational tests prescribed by the regulations. Secs. 1.501(c)(3)–1(a), 1.501(c)(3)–1(b), and 1.501(c)(3)–1(c), Income Tax Regs. *Levy Family Tribe Foundation, Inc. v. Commissioner*, 69 T.C. 615, 618 (1978). On brief, respondent abjured reliance upon the organizational side of the test. We, therefore, focus on the operational test. Section 1.501(c)(3)–1(c)(1), Income Tax Regs., provides as follows:

> (c) *Operational test*—(1) *Primary activites.* An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

Thus, to qualify for exemption petitioner must show that it was at all times relevant hereto operated exclusively for one or more religious purposes, i.e., that it engaged "primarily" in activities the purpose or purposes of which were the accomplishment of religious ends. The term "exclusively" has not been construed to mean "solely" or "absolutely without exception." *Church in Boston v. Commissioner*, 71 T.C. 102, 107 (1978). But if a nonexempt activity is more than an insubstantial part of petitioner's activities, or if any activity of petitioner has more than an insubstantially nonexempt purpose, then petitioner must fail to qualify for exemption. *San Francisco Infant School v. Commissioner*, 69 T.C. 957, 964 (1978); *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945) (dealing with social security taxes). Clearly, the regulations and cases contemplate that a single activity may be carried on for more than one purpose. If a substantial secondary purpose is not an exempt one, qualification under section 501(c)(3) will be denied. The question is one of fact. See, e.g., *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 (1978).

We have noted that the church had its genesis in a discussion group of college students who gathered to consider ethical principles that should govern an individual's life. The group subsequently formalized itself into a club with regular meetings and an agenda. Topics of a wide nature were discussed; both ethical and political ideals were evaluated. Some of its members formed a political party. Petitioner itself described its founding in the following proposed finding of fact:

> At the time of its founding, the Church was an outgrowth of a group of

people who had been meeting informally for three years prior. It was formed as a result of their recognition that no existing religion based its doctrines upon what they had come to believe was proper, of the community of spirit, belief and interest that had developed among some of those who had been attending those meetings, and of their commonly felt need for a purely voluntarist and independent vehicle through which they could explore and propagate their beliefs and help themselves and others to more fully understand them and to live voluntarist lives.

Petitioner has claimed exemption as an organization engaged in religious activities. If the purpose of petitioner's activities is exclusively religious, i.e., is not more than to an insubstantial degree nonreligious, then it will qualify. We need not reach, however, the religiosity, or lack thereof, of petitioner's activities and purposes inasmuch as, even assuming a religious quality to petitioner's activities and purposes, petitioner has failed to show that these activities and purposes were not social/political to more than an insubstantial degree. It has failed to show that it has successfully segregated the clearly social and political aspects from the portion of the meetings designed solely to further its central doctrine of ethical egoism.

Both before and after the April 1976 decision to hold church meetings prior to club meetings, it seems to us that the evenings were primarily social/political events having predominately social and political content and purpose. Indeed the effort to segregate, at least formally, a purely "church" period prior to supper and the formal club meeting indicates that, even in petitioner's eyes, the remainder of the evening had insufficient libertarian religiosity. Club meetings were conducted in a substantially identical manner both before and after the church was founded and, as noted, both before and after the church meetings were segregated from club meetings.[4] These club

---

[4]We note, with respect to the similarity of the modus operandi of the club, both before and after church meetings were formally segregated therefrom, the following quotations from the newsletter:

*April 1975*

"The Libertarian Supper Club of Los Angeles is an informal association of those of the libertarian persuasion who meet monthly, usually on the first Tuesday of the month, for supper together and to hear a speaker or other type of program, and discuss the ideas presented. There is no form of charter and no officers or dues, expenses being covered by the charge for meals and postage payments to cover the cost of mailing the monthly *Newsletter*/meeting notice (10¢/month or $1.20/year). 'Membership' consists of all who desire to remain on the mailing list and pay the postage, 224 this month."

meetings no doubt provided a stimulating atmosphere in which persons of like libertarian mind could socialize, politicize, and philosophize. They certainly furnished an opportuniy for any attendee to make an announcement on any subject whatsoever. The religious aspects of such conclaves seem, however, at least on the record before us, indistinct. By the same token, there is no evidence that, after they were segregated from the club meetings, the church meetings were conducted in a significantly different manner than the club meetings or had significantly different content. We are not convinced that the church meetings were not in reality merely an extension of the club meetings without any substantive change in content or purpose. Certainly, there is no indication that the primary activity of the evening was to develop and further the doctrine of ethical egoism, even if we assume that such a doctrine can be said to have the place in the lives of libertarians filled by God in those creeds admittedly exempt under section 501(c)(3). See *United States v. Seeger*, 380 U.S. 163, 176 (1965).

Similar reasoning applies to petitioner's publication of the newsletter—which is another substantial activity of petitioner. As the sponsorship of basically social/political evenings and a newsletter were substantial purposes of petitioner, and as these operations were nonreligious to more than an insubstantial degree, we conclude that petitioner has failed to show that it qualifies for exemption from tax under section 501(c)(3).

*Decision will be entered for the respondent.*

---

*June 1977*

"The Libertarian Supper Club, sponsored by the First Libertarian Church, is an informal association of those of the libertarian persuasion who meet monthly, usually on the second Monday, for supper together and to hear a speaker or other type of program, and discuss the ideas presented. There is no formal charter and no officers or dues. Meetings of the Church are held just prior to each meeting of the Supper Club, at the same location. Membership in the Church is not required for attendance; both meetings are open to the public. Persons who make contributions to the Church for its *Newsletter* Fund (postage, etc.) have their names added to the mailing list for the *Newsletter*, which serves as meeting notice. All contributions to the Church are tax-deductible."