CARTER HAWKINS CANADA (F.K.A. LARRY E. CANADA, JR.) AND KATHERINE N. CANADA, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28232–82.     Filed June 18, 1984.

*Robert E. Johnson* and *Stephen D. Smith*, for the petitioners.
*Reid M. Huey*, for the respondent.

TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Year | Deficiency |
| --- | --- | --- |
| Carter Hawkins Canada | 1973 | $19,105.17 |
| (f.k.a. Larry E. Canada, Jr.) | 1974 | 76,473.53 |
| and Katherine N. Canada | | |
| Katherine N. Canada | 1975 | 67,570.11 |

After concessions, the sole issue for decision is whether petitioners are entitled to deduct, as charitable contributions pursuant to section 170,[1] amounts attributable to land and money transferred to the Kneadmore Life Community Church (KLCC).

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

Carter Hawkins Canada, formerly known as Larry E. Canada, Jr. (Larry), resided in Montecito, Calif., and Katherine N. Canada (Katherine) resided in Bloomington, Ind., when they filed their petition herein. Petitioners were married and timely filed joint Federal income tax returns for 1973 and 1974. Petitioners were divorced in 1975,[2] and Katherine timely filed a Federal income tax return for that year.

For several years prior to the years in issue, petitioners resided in Nashville, Brown County, Ind. Nashville is approximately 20 miles from Bloomington, Ind.; Indiana University is located in Bloomington. In the late 1960's, petitioners and some of their friends, who were very interested in "alternative life styles," began discussing the formation of an "intentional community where [they] could pursue common values of living in harmony with nature." These persons were particularly concerned with pollution, pesticides, herbicides, food additives, and organic living. Petitioners became so interested "in having people intentionally live together so that they could help each other further back to the land and close to the land type values" that Katherine began buying land and making it available for interested people to live on. Most of this land was near the town of Needmore, Brown County, Ind.

By 1971, approximately 50 people were associated with "the community." Many of the "community people" had attended Indiana University. Larry's presence was a significant factor in attracting some people to the community. The community people either lived on the "community" land Katherine owned[3] or lived nearby and participated in "community" events. Numerous meetings were held among "community" members. Regularly scheduled meetings were held on Sundays and Wednesdays. The Sunday meetings were held, weather permitting, at a place known as the "Indian Mound." These outdoor meetings were fairly unstructured and spontaneous. Singing and eating a pitch-in supper were typically among the meetings' activities. Many spiritual traditions from the Hindu,

---

[2]Pursuant to a property division agreement reached by petitioners at the time of their divorce, Katherine agreed, inter alia, to assume any tax liability Larry incurred by filing joint returns with Katherine.

[3]Several houses were already standing on the land Katherine purchased. Some community members lived in those houses; others built their own homes on community land. Of those persons building homes, some incurred the entire expense themselves while others used materials already available on community land.

Buddhist, Muslim, and Christian faiths, including, inter alia, chanting, sufi dancing, and singing "traditional" Christian hymns, were also observed. Marijuana was smoked at these meetings. During inclement weather, these Sunday meetings were held at the community store in Needmore (the Needmore store).[4] The Wednesday evening meetings, which were held at the Needmore store, sometimes involved these same types of activities. However, the Wednesday meetings "were often relatively talky meetings, relatively business oriented meetings." Matters commonly discussed at these Wednesday meetings, and also sometimes at the Sunday meetings, included who was interested in living where, who was interested in building what type of housing facility on "community" land, who was interested in joining the community, and what crops were to be planted in various fields. On occasion, the "business" might have to do with a matter such as the use of DDT to kill insects or the use of newspaper mulch in the community garden, which some community members considered "fundamentally spiritual" because the discussion focused on "what are we doing?" and "what does this mean for all of our lives?" Finally, these meetings involved socializing and discussions about politics and the general philosophy of life. There were also various work parties when someone would be building or doing something where the efforts of others would be helpful.

One of the goals of the community was for each member to have an equal say in how the community was run. However, since Katherine owned the "community" land, petitioners' say on matters, especially on questions like who could build what and live where, tended to be more equal than others; if Larry did not want someone living on "community" land, he threw the person off the land even though the community supported that person's "right" to live there. It finally became clear to the community that it "could not really be a self-controlling organization unless it had actual control over the land." Concerns were also expressed that the community lacked the organizational structure to easily make decisions on questions like whether a project of benefit to the entire community should be undertaken.

---

[4] After the Needmore store burned down, meetings formerly held there were held at various homes.

At some point, apparently in early 1971, Katherine decided to give the community title to "its" land. Members of the community then began considering what type of organization to form to hold the land. Numerous organizational forms, including an unincorporated association, a for-profit corporation (with a pig farming and lumbering orientation), and a not-for-profit organization, were considered. Finally, someone (not either of the petitioners) suggested that the community become a church. Since there was no organizational structure specifically designated for "intentional communities oriented toward furthering values of husbanding the earth's resources," the church designation seemed the best alternative. Two of the most significant features of the church[5] structure from the community's standpoint, were that (1) it was very egalitarian and democratic (anyone who wanted to be a trustee could be), and (2) it could hold real estate. The church designation was also significant from petitioners' perspective, as they hoped the gift of land would be tax deductible.

Guy Loftman, a community member (and later a lawyer), drafted the articles of incorporation from forms supplied by the State. The articles were filed with the Indiana secretary of state on May 25, 1971. The name adopted for the church, "Kneadmore Life Community Church" (KLCC), expressed the group's commitment to a "life community."[6] Forty-three people were listed as the church's trustees;[7] all one had to do to become a trustee was sign the articles of incorporation at the meeting where they were presented. The purpose of the corporation, as stated in the articles, is:

to serve as a legal structure through which the Kneadmore Life Community Church can execute legal transactions, hold land, and handle resources. The purpose of the Church is to glorify God without doing Him harm. We seek to be His stewards, bring forth His bounty from His fields and His universe without poison substances, or acts, or spirits. We hope to please Him with

---

[5]All references to the KLCC as a "church" are for convenience only and should not be interpreted as recognizing the organization's status, for Federal income tax purposes, as a charitable organization under sec. 170.

[6]The name "Kneadmore" was a pun on the community's location in "Needmore." The name "Needmore" was resented by members of the community because "[they] were into less consumption and getting by with what the land freely gives rather than needing more and more and more and more." "Kneadmore," on the other hand, represented kneading the bread, working the land, etc.

[7]Among the listed trustees were a very young child whose parents were also trustees and "some who were very tangentially related to the community."

happiness borne of good faith, good acts, and good spirits. We seek peace with all.

The articles contained no provision for the distribution of assets upon dissolution of the organization.

The church had no particular set of beliefs; each member was free to choose his or her own beliefs provided he or she did not interfere with those of others. Trustees were not required to renounce any former or other religious beliefs prior to signing the articles of incorporation. The church had no ministers; everyone was "considered equal." One member, who was a minister in the Universal Life Church, did perform at least one wedding ceremony.

On September 9, 1971, Katherine deeded to the church several parcels of real estate (the Needmore property), which had a stipulated value, at the time of the gift, of $244,489.14. Petitioners' home in Brown County was not included in the property deeded to the KLCC. A restrictive condition and covenant, inserted into the deed by Katherine, provided that:

It is expressly agreed and understood that the real consideration for this conveyance is the founding of the Kneadmore Life Community Church and the community which is a part of said church. That the success of said church in said community depends on the land herein conveyed being free and unencumbered by said church or any of its members. Therefore, should the grantee cause said land to be encumbered or attempt to sell any tract herein conveyed that in that event the land shall revert to the grantor and the grantor shall have the right to take immediate, full and complete possession thereof.

That this restriction shall be for a term of ten (10) years from the date of this conveyance and shall terminate at the end of said period and shall be null and void with no force and effect at that time.

Katherine inserted this covenant in the deed because she was concerned that people who lived in the community only for the summer months "didn't really have any kind of ties to the place" and would cause the land to be sold off, and because Larry was dissatisfied with "the entire chain of events" and was very adamant that Katherine insert the clause as a "precaution."

After the church acquired title to the Needmore property, it needed money to pay property taxes on the land.[8] Consequent-

[8]The church did not attempt to acquire tax-exempt status from the State because church

ly, the church began imposing dues, called "taxes," on its members. These "taxes" were paid both by church members who lived on the Needmore land and by those who lived nearby; in June 1972, taxes were established at $10 per month for members living on church land and $5 per month for members living off church land.[9] The church also held fund-raising events like dances and music festivals.[10] The money raised by the church was also used, inter alia, to install public showers and washing machines for use by community members, to buy seed to plant fields, to purchase and repair farm equipment, and to bale hay.

Life at the community did not change much after the church was incorporated. No one paid any money, other than "taxes," to live on the Needmore land. The community had a community garden and community orchards where food was grown for community members. Almost everyone also had an individual garden where food was grown for his own consumption and/or for sale. Wood was cut for individual purposes. It was thus very cheap to live on community land.[11]

Some community members had cows and/or goats and sold the milk. Other community members conducted businesses such as a carpentry shop and a garage on community land. Moneys received by these businesses were not turned over to the church; they were for personal use. Many of the community members had outside jobs. Several community members received, at various times, welfare checks and/or money from their parents. No one performed other than minimal services for the church; members basically did their own thing.

Initially, there were no requirements to become a church member; all one had to do was participate in community activities. Similarly, there was no procedure for expelling a member. In January 1973, a policy was established whereby regular church membership was conditioned upon satisfactory completion of a 6-month trial period of living on the Needmore

members wanted to "get along" with their neighbors in Brown County and thought it would be "bad judgment" to try to take the land off the tax rolls. During the years in issue, the church did not apply for exemption from Federal taxes.

[9]In October 1973, taxes were raised to $10 for all members.

[10]Some community land was apparently rented to outsiders. In one instance, the KLCC "preferred to trade in beer or the like rather than money" for land to be rented to an inn for a sign.

[11]One witness estimated that, in the spring/summer/fall of 1971, a community member "could live for six months [for less than] ten dollars * * * if you didn't drink beer."

land.[12]

At a meeting in January 1973, it was decided, with Katherine's approval, that the church would attempt to sell two pieces of church property. However, at a meeting in February, it was reported that the papers necessary to convey the two properties were ready but that Katherine would not sign a release of the restrictive covenant because there was no clear consensus on what the funds were to be used for. Finally, in 1974, Katherine approved the sale of two properties to herself and Larry for $4,500; proceeds from the sale were to be used to build a "community building."

On July 2, 1975, Katherine donated $10,500 toward construction of the community building. The gift contained, inter alia, the following provisos:

(7) That the Corporation will complete, by December 31, 1978, the structure to be known as the Kneadmore Life Community Church, Inc., Community Center to the extent permitted by the expenditure of one hundred percent (100%) of the funds raised by the Contributor for said construction.

(8) Should the Corporation breach this Agreement, it agrees that it will lease to the Contributors the buildings and appurtenant land set aside for said Community Center as the same shall exist at the time of said breach for a term of twenty-five (25) years at an annual rental of one dollar ($1.00) per year * * *

*       *       *       *       *       *       *

(11) In the event the Community Center has not been completed by the date herein specified for its completion for reasons other than lack of funds for the acquisition of materials, supplies and fixtures, any then undisbursed funds contributed by Contributor shall revert to and be paid back to Contributor.

Construction of the building began in the summer of 1975; the building was not completed prior to Katherine's departure from the church in 1976. Katherine never made any attempt to ascertain whether the church complied with the provisions in the gift; she never recovered any of the money given to the church.

In 1976, Katherine moved to Bloomington, Ind., and disassociated herself from the church. On May 7, 1976, in order to

---

[12]Similarly, in December 1972, the church formalized the procedure whereby trustees were selected.

"cut all ties with the past," Katherine quitclaimed the previously donated property to the church, thereby releasing the restrictive condition and covenant in the 1971 deed.

During the years in issue, petitioners made cash contributions to the church, other than the one discussed above, of $410. Petitioners claimed a charitable contribution carryover on their 1973 and 1974 returns, and Katherine claimed a charitable contribution carryover on her 1975 return for the unused portion of the 1971 gift of the property to the Kneadmore Life Community Church.

OPINION

Charitable contributions cannot be deducted unless they are made to organizations described in section 170(c). Sec. 170(a). Pursuant to section 170(c), petitioners' contributions are not deductible unless the KLCC was "organized and operated exclusively for religious * * * purposes * * * no part of the net earnings of which inures to the benefit of any * * * individual.[13] The burden of proof rests with petitioners. Rule 142(a).

An organization is operated "exclusively" for exempt purposes if its activities primarily serve one or more exempt purposes and not, except to an insubstantial degree, a nonexempt purpose. Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs.[14] The existence of a "single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). See also *Nat. Association of American Churches v. Commissioner*, 82 T.C. 18, 28–29 (1984). The purpose toward which an activity is directed, rather than the nature of the activity itself, determines whether the operational test is satisfied. *Bethel Mennonite Church v. Commissioner*, 80 T.C. 352, 360 (1983), on appeal (7th Cir., July 11, 1983). "[A]n organization is not operated

---

[13]Respondent does not contend that the church attempted to influence legislation or participate in, or intervene in, any political campaign. Petitioners do not contend that their contributions are deductible under any other provision of sec. 170.

[14]The regulations under sec. 501(c)(3), which determine whether a religious organization is tax exempt, may be utilized in determining whether petitioners' contributions to the KLCC are deductible under sec. 170(c), because the requirements of sec. 501(c)(3) parallel those of sec. 170(c). See *Calvin K. of Oakknoll v. Commissioner*, 69 T.C. 770 (1978), affd. by order 603 F.2d 211 (2d Cir. 1979).

exclusively for exempt purposes unless it is operated for the benefit of the public rather than for the benefit of a private interest." *Church of the Transfiguring Spirit v. Commissioner*, 76 T.C. 1, 5 (1981). See also *Bob Jones University v. United States*, 461 U.S. ____ (1983). Additionally, the statute requires that no part of the organization's "net earnings" inure to the benefit of any private individual. Sec. 170(c)(2)(C).

In determining whether these conditions are satisfied, the "operated exclusively for exempt purposes" and the "private inurement" requirements often substantially overlap. See *Church of the Transfiguring Spirit v. Commissioner, supra* at 5 n. 5.[15] The fact that the KLCC may have been operated for religious purposes is not sufficient to satisfy the "private inurement" test. *Church of the Transfiguring Spirit v. Commissioner, supra* at 5–7; *Levy Family Tribe Foundation v. Commissioner*, 69 T.C. 615, 619 (1978). Similarly, "net earnings" include more than net profits and may inure to the benefit of private persons other than in the distribution of dividends. *Unitary Mission Church v. Commissioner*, 74 T.C. 507, 512–513 (1980), affd. without opinion 647 F.2d 163 (2d Cir. 1981). Cf. *Church of the Transfiguring Spirit v. Commissioner, supra.*

Respondent contends that the KLCC was operated to a substantial degree for nonexempt purposes in that it benefited private interests. Specifically, respondent points out that community members could live on, raise animals and grow crops for personal consumption and for sale on, and conduct businesses on, community land without paying rent to the KLCC and that the KLCC carried on communal activities such as community gardens and orchards and communal use of KLCC farm equipment and seeds. Moreover, students (or ex-students) from Indiana University were often drawn to the community for the purpose of exploring alternative lifestyles.

Petitioners contend that the KLCC was operated exclusively for religious purposes, because its members "*lived* their commitment to the Kneadmore Life Community Church and its ideals by residing on Church land, practicing their religious beliefs and traveling from the community to share their beliefs with others." (Emphasis in original). Any inurement that may

---

[15]See also *New Life Tabernacle v. Commissioner*, T.C. Memo. 1982–367.

have arisen from living on church land was, according to petitioners, "de minimis."

For the reasons hereinafter set forth, we agree with respondent's contention that the KLCC was not a "religious organization." We do so on the ground that the KLCC satisfies neither the nonexempt purpose test nor the private inurement test. We therefore need not consider respondent's other arguments.[16] Nor need we consider petitioners' further argument, advanced in order to sustain their carryover under section 170(d) to the taxable years at issue of the claimed 1971 contributions, that the KLCC was a "church"; if the KLCC is not a "religious organization" within the meaning of section 170(c), it obviously is not a tax-exempt "church." See *Unitary Mission Church v. Commissioner, supra* at 512 n. 5.

We preface our analysis in support of our conclusion by emphasizing that we accept the sincerity of the beliefs of the members of the KLCC, the religious character of their beliefs, and the assertion that the KLCC was their chosen instrument alike for furthering their beliefs.[17] Our rejection of petitioners' position rests upon our conclusion that the use of the KLCC property (indeed, the very property which was the subject of the 1971 claimed charitable contribution) was impermissible in that the members of the KLCC derived a substantial personal benefit from such use. Thus, we avoid the "most delicate question" (*Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972)) of whether the beliefs of the members of the KLCC or the principles of the KLCC were in fact religious or whether

---

[16]Among respondent's other arguments are: (1) Katherine's transfer of real estate to the KLCC included a condition subsequent, the occurrence of which was not so remote as to be negligible (see sec. 1.170A–1(e), Income Tax Regs.); *Briggs v. Commissioner,* 72 T.C. 646 (1979), affd. without published opinion 665 F.2d 1051 (9th Cir. 1981); (2) Katherine failed to establish that she relinquished complete control over property transferred to the KLCC pursuant to an agreement dated July 2, 1975 (see sec. 1.170A–1(e), Income Tax Regs.); *Briggs v. Commissioner, supra;* (3) the KLCC's articles of incorporation failed to limit the church's activities to exclusively charitable purposes (see sec. 1.501(c)(3)–1(b)(1)(i)(a), Income Tax Regs.), or provide for a disposition of assets upon dissolution (see sec. 1.501(c)(3)–1(b)(4), Income Tax Regs.); *General Conference of the Free Church v. Commissioner,* 71 T.C. 920 (1979). Although we need not consider those arguments to decide this case, we would note that many of them appear to have merit.

[17]Petitioners' opening brief states that the KLCC's religious "philosophies * * * essentially comprise the following basic ideals: (a) the earth is a living organism created by God; (b) all living things on the earth are also God's creations; (c) the earth should be treated with a reverence that would be reflected in the community's activities; (d) the different religious philosophies from various western, middle eastern, and eastern cultures should be pursued; and (e) God was common to all religious philosophies, whether they be Buddhist, Hindu, Jewish, Christian or other established religions."

they represented merely a deeply held philosophy or lifestyle. See *Wisconsin v. Yoder, supra* at 215–216.[18] We observe, however, that judicial sensitivity to governmental impingement on religious beliefs has, in general, been evidenced in cases involving such impingement on pursuit of those beliefs by individuals rather than in the context of a situation, such as is involved herein, where the issue is the entitlement to the benefits of an exemption from tax as a religious organization. E.g., *Wisconsin v. Yoder, supra*; *United States v. Seeger*, 380 U.S. 163 (1965). Compare *Bob Jones University v. United States, supra*; *United States v. Lee*, 455 U.S. 252 (1982). See generally *Church of the Chosen People v. United States*, 548 F. Supp. 1247 (D. Minn. 1982).

The record herein is replete with testimony indicating that the activities pursued by the KLCC (and the lifestyle adopted by KLCC members) served secular purposes. For example, Bonnie Lucas testified:

the activities [of the community] were basically farming activities, taking care of the families. We had spiritual gatherings and dinners together. And it was very much the feeling of an extended family. It was basically an experimental community. And we felt as though the things that were important to us were something new and something we wanted to try out. For instance, organic farming is now, you know, very common. * * * If you want to sell a product now all you have to do is put pure, you know, natural on it and you sell millions of it, you know. But back then everything had extra salt and extra additives, preservatives, sugars, you know. And basically all the things that we believed in are now pretty mainstream society.

Thomas D. Canada, who married Katherine in 1976, testified that:

When I moved out to Kneadmore it was basically a—well, it was a peer—it was a thing that was happening across the country with a number of people of my age at that point in time that were looking for something of a little bit more human life style, what we considered to be more human life style in relationship to having respect for the earth and trying to understand some of

---

[18]"[W]e must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. * * * Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious." [*Wisconsin v. Yoder*, 406 U.S. 205, 215–216 (1972).]

the basics and where exactly did the food chain start and where did your energy chain start from.

I was, myself, from a suburban background and had never had any experiences with cutting my own firewood or carrying my water just for my basic sustenance because before then it was always flipping a few dials or turning a few taps. * * * We had some buffalo out there which were very nice and that gave a different kind of background when you had buffalo coming up to your back door. And a lot of woods and a lot of places to basically contemplate what, in fact, we were trying to do. And that really simply came around to trying to help each other out.

I think essentially we were trying to—we were very much into the food chain aspects, what was happening with the food we were ingesting into our bodies. And at that point in time there were not many organic based farms around the area that could supply us reasonable food. So everyone felt that food was the common denominator and that not having chemicals within your food was a reasonable endeavor which we could try to unite on, as ignorant as we may have all been as far as farming procedures and the hard work that that entails to produce.

While practicing organic farming and eating organic foods may well have been consistent with the KLCC's religious purposes, it is clear that such activities constituted secular purposes as well. Petitioners have not even argued that their religious beliefs necessitated, in any way, that the church own the Needmore land, permit its members to reside there rent free, and purchase farm equipment and seed for members' use, and, indeed, we would have great difficulty in sustaining any such contention. The reason the land was transferred to the KLCC was so that the community could control its own affairs, including who could live on "community" land. Indeed, the whole concept of the community originally had nothing whatsoever to do with religion. The entire focus of the community was on concern for the environment and "land type values." Similarly, the desire to pursue alternative lifestyles as a community had nothing to do with religion. The late 1960's to early 1970's was a tumultuous period for America and its youth, and many young people were rejecting, at least temporarily, the urban or suburban lifestyle to which they were accustomed in favor of "a little bit more human life style" ("cutting my own firewood * * * carrying my water just for my basic sustenance"); as Thomas D. Canada observed, you had "a different kind of background when you had buffalo coming up to your back door." We do not disagree with petitioners that the lifestyle they hoped to promote has certain

advantages over urban and/or suburban living; we simply find that petitioners have not proven that the KLCC was operated exclusively for religious purposes. Notwithstanding the inspirational language in the articles of incorporation and the experimentation community members did with various religious practices, it is clear that the driving force behind the community was not religious. When the community decided to acquire a formal organizational structure, numerous types of organizations, including a for-profit pig farming corporation, were considered before the church structure was initially suggested and adopted. We simply cannot believe that if the community members were pursuing organic farming and alternative lifestyles for religious reasons, they would have thought of a for-profit pig farming corporation before a church.

The instant facts are quite similar to those in *Hutterische Bruder Gemeinde v. Commissioner*, 1 B.T.A. 1208 (1925), and *Hofer v. United States*, 64 Ct. Cl. 672 (1928), which involved the South Dakota commune of a religious order. This religious order, which was founded in Europe several hundred years ago, "had as one of its chief principles the leading of a communistic life by its members in accordance with precepts contained in the New Testament, as interpreted by them." *Hutterische Bruder Gemeinde v. Commissioner, supra* at 1208. Each person joining the commune had to transfer all of his or her property to the commune for the common use of all members. No commune member received compensation for services to the commune other than the necessities of life (food, clothing, and lodging). The commune owned during the late 1910's approximately 18,000 acres, of which approximately 10,000 were agricultural. A wide variety of farm goods was produced by the commune, both for personal consumption and for public sale. In 1917, the commune's net income from sales of farm products to the public was $145,969.50. In 1919, it was $25,933.46. Each year the commune purchased land with its profits. The commune had 122 members in 1919; numerous relatives of members also lived on the commune...

In *Hutterische Bruder Gemeinde v. Commissioner, supra* at 1211–1212, the Board of Tax Appeals accepted the order's religious beliefs,[19] focused on the for-profit farming activities of the commune, and stated that—

---

[19]The commune maintained its own church and school. Regular church services were held on

The statutory exemption of religious corporations from the payment of Federal taxes is based on the assumption that all the income of such organizations shall be used for the purposes of their foundation and that the public interests will be served by such uses. * * *

It is difficult to discover any benefit to the public flowing from the activities of this taxpayer. * * *

The members of the taxpayer have elected, as is their right under the laws of the Republic, to lead a communistic life. *They constitute, in effect, a single family with two principal purposes—the one to lead the sort of religious life that is pleasing and acceptable to them; the other to conduct business operations for the twofold purpose of supplying their own simple physical needs and enlarging their communal possessions.* * * * [Emphasis added.]

The Board concluded that, although the Hutterische Bruder Gemeinde may have been established for religious purposes, it had failed to prove that it was operated exclusively for those purposes.

In *Hofer v. United States, supra* at 684, the Court of Claims observed that—

the income as well as the property [of the commune] was in large degree held for the common use and benefit of its members to be used for their support and maintenance * * *. Certainly it may not be said that no part of the net income inured to the benefit of any individual. It was for the benefit of its members. Nor can it be said that such a corporation was operated exclusively for a religious purpose. * * *

We find the rationale of *Hutterische Bruder Gemeinde* and *Hofer* controlling notwithstanding the large differences in the amounts of income earned by the commune therein and by community members herein.[20] In each situation, group members were provided with a place to live and food to eat. In *Hutterische Bruder Gemeinde* and *Hofer*, the courts found the organization operated for a substantial nonexempt purpose even though the group's religious tenets specifically dealt with the type of lifestyle members were to lead. Herein, petitioners have not even alleged that their religious doctrines controlled their lifestyle (other than perhaps the type of food they should eat). Consequently, the KLCC's provision of land, seeds, etc.,

---

Sundays. General church services were held each weeknight and members were required to have individual prayer before retiring.

[20]As we have previously pointed out, the rationale in determining whether an organization satisfies the private inurement test does not turn upon whether the benefits received by private persons are derived from "income" or "net earnings" of the organization itself in an accounting or tax sense. See pp. 981–982 *supra*.

rent free, to enable its members to have shelter and to grow food (some of which was sold by the members to outsiders, with the proceeds retained by the members), among other things, clearly constituted the operation of a substantial nonexempt purpose and/or private inurement. See *Beth-El Ministries, Inc. v. United States*, an unreported opinion (D. D.C. 1979, 44 AFTR 2d 79–5190, 79–2 USTC par. 9412). Cf. *Bethel Mennonite Church v. Commissioner, supra.*[21]

Our recent decision in *Alive Fellowship of Harmonious Living v. Commissioner*, T.C. Memo. 1984–87, involved facts somewhat similar to, but clearly distinguishable from, those herein. The taxpayer therein established several facilities for instructing others in its practices and beliefs. Fifty-nine of the fellowship's followers served as staff members. In exchange for the long hours put in by the staff (in such matters as teaching courses, providing office management, kitchen help, construction, and maintenance), they received room, board, medical care, an allowance (averaging $350 per person per year), paid on a "cash available" basis, and certain other benefits. Respondent contended that the fellowship was operated in substantial part in furtherance of a commercial purpose. We concluded, however, that the fellowship was operated exclusively for *exempt* purposes and that no part of its earnings inured to the benefit of private individuals, because its members gave their time "to a structured program devoted to instruction in petitioner's concededly religious doctrines." *Alive Fellowship of Harmonious Living v. Commissioner, supra*, slip op. at 21.[22]

We rested our conclusion on the ground that the compensation received by the fellowship's members was reasonable, even "modest," in light of the *full-time services* they performed for the organization. While the benefits received by KLCC members who lived on the Needmore land might have been "modest" (lodging, farm land, farm equipment, and seed in return for a small monthly "tax"), they were not "reasonable

---

[21]See also *New Life Tabernacle v. Commissioner*, T.C. Memo. 1982–367.

[22]We also noted that "the clergy of many religious organizations which concededly qualify under section 501(c)(3) support themselves with the compensation they receive for teaching the doctrines of their respective faiths. So long as that compensation is not excessive in relation to the work performed, we do not think it requires a conclusion that the organization serves private rather than public interests." *Alive Fellowship of Harmonious Living v. Commissioner*, T.C. Memo. 1984–87, slip op. at 23–24.

compensation," as no services (other than perhaps serving as a trustee or secretary) were performed by community members for the KLCC. The record herein indicates that many community members held full-time jobs and used community land to grow food for their own subsistence. Activities undertaken by the KLCC's "work parties," such as to improve members' living conditions (for example, by helping a member build a log cabin on community land), while praiseworthy, cannot be equated, in this case, with religiously motivated purposes. We reject petitioners' contention that the provision of the foregoing benefits to the members of the KLCC was "de minimis." In this connection, we further note that the applicability of the "private inurement" test does not turn upon the amount or extent of the benefits conferred. *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 412 F.2d 1197, 1202 (1969); *McGahen v. Commissioner*, 76 T.C. 468, 482 (1981), affd. without published opinion 720 F.2d 644 (3d Cir. 1983). Nor can we conclude, on the basis of the record herein, that the "taxes" paid by the members constituted fair consideration for the benefits received.

The long and the short of the matter is that the KLCC was operated for several purposes. We do not doubt that one purpose for which the KLCC was operated was to permit members to explore various religions so that each individual could find God in his own way. Cf. *First Libertarian Church v. Commissioner*, 74 T.C. 396 (1980). However, other substantial purposes for which the KLCC was operated include to permit experimentation with lifestyles different from the ones community members grew up with, to permit like-minded individuals to live together at little or no cost, and to permit members to grow and eat organic food. While eating organic food may have acquired some religious significance along the way, it is clear that, on the whole, the KLCC was operated, to more than an insubstantial degree, for nonexempt purposes and that it afforded its members benefits which violated the "private inurement" test.

*Decision will be entered for the respondent.*