SHARRON M. OHNMEISS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ohnmeiss v. Commissioner
Docket No. 3856-90
United States Tax Court
T.C. Memo 1991-594; 1991 Tax Ct. Memo LEXIS 644; 62 T.C.M. (CCH) 1350; T.C.M. (RIA) 91594; December 2, 1991, Filed *644 Decision will be entered for the respondent. John J. Barsos, for the petitioner. Joel A. Lopata, for the respondent. GOLDBERG, Special Trial Judge. MEMORANDUM OPINION This case was heard pursuant to the provisions of section 7443A(b)(3) of the Internal Revenue Code. [1]
Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax Under Sections
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
1982
$ 1,179
-
$ 86
*
1984
1,917
-
139
*
1985
1,745
$ 175
125
*
*645 The issues for our decision are (1) whether petitioner is entitled to a charitable deduction for amounts paid to the Crossroads New Life Ministries, (2) whether the addition to tax under section 6651(a)(1) for failure to file a timely tax return applies for the year 1985, and (3) whether the additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules and regulations apply for the years 1982, 1984, and 1985. Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioner resided in Hemet, California, when she filed her petition. Sharron M. Ohnmeiss (hereafter petitioner) lives and works at Crossroads New Life Ministries (New Life), a Christian community devoted to the rehabilitation of drug addicts and alcoholics. New Life is a charitable organization, contributions to which are deductible under section 170(a). Petitioner also worked, during the years at issue, for General Telephone of California, doing clerical work on the night shift. Petitioner is one of three members of New Life who hold outside jobs and contribute their earnings to New Life. Petitioner *646 deducted the following amounts: $ 7,872 for 1982, $ 11,111 for 1984, and $ 12,165 for 1985, representing 50 percent of her gross income for each year. In 1972 petitioner met Barbara Rosalez (Pastor Barbara), and they, working together, founded a rehabilitation center located at petitioner's home, taking in homeless people, helping them overcome their addictions, educating them in the Bible and basic literacy, and training them to hold jobs. In 1980, New Life moved to a horse ranch, where it maintained dormitories for single men and women. Petitioner's son and daughter live in these dormitories. Petitioner works as school principal and teacher, leader of religious services, rehabilitation counselor, administrator, clerical worker, cook, and member of New Life's governing body, or covenant family member. She is not an ordained minister, but, like Martha in the Gospel, she serves when hard work is required. New Life members live under a covenant or contract whereby they, like the early Christians, hold no private property and own all material possessions in common. It is as a result of this promise that petitioner turns over her salary to New Life. In the years 1982-1983, her *647 financial arrangements with New Life consisted of simply depositing her paycheck in the New Life bank account. In 1984, she adopted the policy of taking her check to the bank and receiving half of her money in the form of cash and half in the form of a money order, then depositing both the cash and the money order in the New Life account. The use of the money order was to document her contribution of 50 percent of her salary, which she believed, on the advice of an IRS agent, to be deductible as a charitable contribution. Many of her deposits were actually made by various New Life residents, whose training consisted in part of instruction in doing office work. Petitioner also subsidized the New Life community by obtaining credit and buying needed vehicles or buying books for the school in which she taught. Petitioner has not retained documentation of her transfers of funds to New Life or of loans paid and expenditures made on behalf of New Life. Petitioner lived frugally at New Life, but did receive benefits as a resident member of the community. The community paid $ 500 per month in rent for its 118-acre ranch. Food -- often cooked by petitioner -- was provided to her and *648 her children in the communal dining room. Clothing and personal necessities were provided, either from donations or from the funds of the group. Transportation to and from petitioner's job was worked out to coincide with various uses of the New Life vehicles. New Life made no formal provisions for the future and was not supported by scheduled giving like other religious groups. It found support from a number of sources. In some cases, provisions used at New Life were obtained from charitable contributions or subsidized sources, such as food banks and government surplus food. The community supplemented its income by hiring out work crews for garden and cleanup work, and it bred English bulldogs, and Siamese and Bengal cats for sale. Caring for animals was also seen as therapeutic for the New Life residents. New Life had approximately 50 residents at any one time, and those few who received welfare checks or pensions contributed them to New Life. All residents were required to sign an agreement acknowledging that New Life assumed a certain cost in housing them and meeting their basic needs. This cost was adjusted to equal the amount paid for public assistance in California *649 in that year: in 1982-1985, the amount was $ 300 per adult and $ 100 per child. We begin by noting that deductions are strictly a matter of legislative grace, and a taxpayer has the burden of establishing that he or she is entitled to any deduction claimed on the return. Deputy v. du Pont, 308 U.S. 488, 493, 84 L. Ed. 416, 60 S. Ct. 363 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 78 L. Ed. 1348, 54 S. Ct. 788 (1934); Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). All taxpayers are required to keep sufficient records to enable respondent to determine their correct tax liability. Sec. 6001; Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965). In order for petitioner to be allowed a charitable contribution deduction for the amount claimed, she must prove that the recipient qualified under section 170(c)(2). One of the requirements of section 170(c)(2) is that "no part" of the net earnings of the religious or charitable organization inure to the benefit of any private shareholder or individual. Sec. 170(c)(2)(C). Even if the benefit inuring to the individual is small, it is still impermissible. Unitary Mission Church of Long Island v. Commissioner, 74 T.C. 507, 513 (1980), *650 affd. without published opinion, 647 F.2d 163 (2d Cir. 1981). Our nation has a venerable tradition of religious and utopian communities which have practiced communal living. After the institution of our system of taxation, these communities tried to claim that their income was exempt from taxation: Hofer v. United States, 64 Ct. Cl. 672 (1928); Hutterische Bruder Gemeinde, 1 B.T.A. 1208 (1925). These cases involved communities of Hutterites, a group which had its origins in the seventeenth-century Anabaptist movement. The Hutterites lived in Christian agricultural communes, which engaged in normal commercial activities. The Board of Tax Appeals held that the Hutterite community, like any other family, enjoys the protection of the State. "Public policy requires that it shall contribute its share of the revenues necessary to sustain the Government which protects it in its rights and privileges." Hutterische Bruder Gemeinde, supra at 1212. In more recent years, this Court has held that contributions made to communal organizations which offer secular benefits to their members are not exclusively for exempt purposes *651 and hence not tax deductible. Canada v. Commissioner, 82 T.C. 973 (1984); Calvin K. v. Commissioner, 69 T.C. 770 (1978), affd. by order 603 F.2d 211 (2d Cir. 1979). In the Calvin K. case, this Court noted that the regulations under section 501(c)(3), which determine whether a religious organization is tax exempt, may be utilized in determining whether contributions are deductible under section 170(c) because the requirements of sections 501(c)(3) and 170(c) are intended to accomplish the same Congressional purpose. In all these cases, the applicability of the "private inurement" test did not turn upon the amount or extent of the benefits conferred but only on the question of whether there were benefits of any kind. New Life is not engaged in extensive, standard commercial enterprises. Furthermore, it is clear that New Life performs important social and spiritual functions and that its leaders give selflessly of themselves to the extent of their ability. Petitioner has given far more than she has received, having committed all her possessions, her earnings, and her time to New Life. Petitioner and her children did receive *652 provision, however meager, for their necessities from New Life. It would be impossible under the circumstances to place a monetary value on the benefits received, nor have we been asked to do so, as respondent is not seeking to tax them as compensation. Receipt of such benefits, however, constitutes private inurement, and under these circumstances it is impossible to value the amount of the charitable contribution unless the value of the benefits received can be determined. Petitioner argues, on brief, that she is entitled, as a "minister of the gospel," to exclude from gross income under section 107 the rental value of the home provided her. Respondent is not attempting, however, to tax petitioner on the value of the in-kind benefits she has received. The record is also clear that petitioner is not an ordained minister, as is required under section 107. Lawrence v. Commissioner, 50 T.C. 494, 499 (1968). We hold that petitioner is not entitled to deduct as charitable contributions her payments to New Life. Consequently, we do not reach the substantiation issues raised by this case. Respondent also determined that petitioner is liable for an addition to *653 tax pursuant to section 6651(a)(1) for 1985. Section 6651(a)(1) imposes an addition to tax for failure to file a timely return unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioner bears the burden of proof. Rule 142(a). Baldwin v. Commissioner, 84 T.C. 859, 870 (1985). Petitioner's income tax return for 1985 was due to be filed on or before April 15, 1986. It was filed on May 16, 1986. Petitioner has presented no legal justification for filing late. Therefore, respondent is sustained as to the addition to tax under section 6651(a)(1). Respondent also determined additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules and regulations. Respondent's determination is presumed correct and the burden is on petitioner to prove these additions are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Taxpayers are required to maintain permanent books of account or records sufficient to establish the amount of gross income, deductions, credits, and other matters required to be shown in their tax returns. Sec. 1.6001-1(a), Income Tax *654 Regs.
Petitioner's failure to keep records with respect to her contributions is negligence within the meaning of section 6653(a). Petitioner has produced evidence of eight loans obtained through her credit union; only one, however, can be dated as incurred in a year in question and identified as for the purchase of property for New Life. Petitioner has retained no records of her contributions to New Life or her payment of loans in question. New Life's records are incomplete as to the amount of petitioner's contributions and do not bear the usual indicia of reliability of business records. We therefore sustain respondent's determination of additions to tax under section 6653(a). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations.↩